Waseem DAKER, Plaintiff,

v.

Joe FERRERO, et al., Defendants.

Civil Action No. 1:03–CV–02481–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 26, 2007.

Waseem Daker, Duluth, GA, pro se.

Devon Orland, Office of State Attorney General, John C. Jones, Freeman Mathis & Gary, Aaron B. Mason, State of Georgia Law Department, Atlanta, GA, for Defendants.

### *ORDER*

STORY, District Judge.

This case comes before the Court for resolution of Defendants' Motion for Summary Judgment [220]; Plaintiff's Motion for Summary Judgment [234]; and Plaintiff's Motion to Amend his Complaint [245]. After reviewing the record, the Court enters the following Order.

### Background

Plaintiff, proceeding *pro se*, initiated this civil action in August 2003 against De-fendant Joe Philip Ferrero, Acting Commissioner of the Georgia Department of Corrections ("GDC"), and numerous prison officials. In his Fourth Amended Complaint, Plaintiff asserts nineteen claims pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.*, challenging aspects of his confinement in various GDC prison facilities. Specifically, Plaintiff challenges: (i) a requirement that he "stand at attention" in the presence of prison officials; (ii) a restriction on his wearing of a Kufi, a traditional article of Muslim headdress; (iii) a denial of his request to possess a digital device containing the text of the Qur'an; (iv) content-based restrictions on the sending and receiving of prisoner mailings and publications; and (v) the sufficiency of the procedures afforded to inmates and senders of mail when prisoners are denied certain mailings and publications.[1] On October 25, 2005, Plaintiff was released from prison, but he continues to pursue this litigation.

This Court has previously dismissed on sovereign immunity and mootness grounds

---

1. A number of Plaintiff's claims purport to challenge the facial constitutionality of certain prison policies. However, as the Court discusses below, the scope of this action is significantly limited by mootness considerations because Plaintiff has been released from prison. *See Wardell v. Duncan,* 470 F.3d 954, 957 (10th Cir.2006) (noting that, "[a]lthough the complaint suggests a broad facial attack on the regulations prohibiting gift purchases of subscriptions and the like, the case has been narrowed substantially" because the plaintiff had been released from prison). For ease of reference, the Court details below the list of policies Plaintiff purports to challenge in his Complaint:

Claim 1: Stand-at-attention requirement

Claim 2: Restrictions on wearing a Kufi

Claim 3: Content-based denial of mail and publications

Claim 4: Denial of procedural due process when mail denied (prisoners)

Claim 5: Denial of procedural due process when mail denied (non-prisoners)

Claim 6: Requirement that mail be addressed to dormitory

Claim 7: Denial of procedural due process when publications denied (prisoners)

Claim 8: Content-based denial of foreign language publications

Claim 9: Denial of procedural to process when publications restricted (non-prisoners)

Claim 10: Denial of gift publications (that are not paid in full by prisoner)

Claim 11: Pre-paid Requirement for publications

Claim 12: Requirement that Prisoner request book by name, title, and description

Claim 13: Restrictions on size and number of publications possessed

Claim 14: Seizure of publication without procedural due process

Plaintiff's claims against Defendants in their official capacities.[2] The Court has also dismissed Plaintiff's digital-Qur'an claim, after finding that Defendants were entitled to qualified immunity because the right to a digital Qur'an was not clearly established. *See Daker v. Ferrero*, No. 1:03-CV-02481, 2006 WL 346440, at *2 (N.D.Ga. Feb. 13, 2006) [hereinafter *Daker I*] (discussing Order of Aug. 15, 2005).

The Court now takes up Plaintiff's remaining claims, which, by virtue of the Court's previous rulings, are brought solely against Defendants in their individual capacities.

## Discussion

## I. Preliminary Matters

### A. Plaintiff's Claims Brought as a Non-Prisoner

Following Plaintiff's release from prison in October 2005, Plaintiff sought to amend his Complaint for a fourth time to add several claims arising both during his incarceration and after he was released from prison. By previous Order, the Court granted Plaintiff leave to add his claims arising out of his incarceration, but denied Plaintiff leave to add claims arising after his release, finding that "Plaintiff's release from prison altered his position in such a dramatic and fundamental way that claims brought in his capacity as a non-incarcerated citizen should not be conflated with those he initiated as a prisoner." *Daker I,* 2006 WL 346440, at *6.

Plaintiff's Fourth Amended Complaint asserts two claims as a non-prisoner. Claim 5 alleges that due process requires that the sender of mail to a prisoner be afforded notice and an opportunity to appeal a decision by prison officials to censor the mail. (*See* Fourth Am. Compl. ¶ 85.) Similarly, Claim 9 alleges that due process requires a sender of a publication to a prisoner to be afforded notice and an opportunity to appeal a censorship decision. (*See id.* ¶ 89.) In its previous Order, the Court declined to grant Plaintiff leave to assert as a non-prisoner claims arising after his release from prison. As such, the Court hereby **DISMISSES** without prejudice Claims 5 and 9.[3] (*See* Pl.'s Compl. ¶¶ 85, 89.)

### B. Plaintiff's Motion for Leave to Amend

By Order dated January 3, 2007, this Court observed that Plaintiff's Fourth Amended Complaint appeared to omit any

---

Claim 15: Denial of legal materials of other inmates

Claim 16: Requirement that printed material be received from publishers or attorney

Claim 17: Requirement that specific request be made to receive publications from dealer

Claim 18: Retaliation for filing this action and related grievances

Claim 19: Denial of Digital Qur'an

2. By previous Order, this Court dismissed Plaintiff's official-capacity claims under RLUIPA and § 1983 for monetary damages, concluding that the Eleventh Amendment barred such claims. *See Daker v. Ferrero*, No. 1:03-CV-02481, 2006 WL 346440, at *8 n. 5 (N.D.Ga. Feb. 13, 2006) [hereinafter *Daker I* ] (discussing Order of Aug. 15, 2005 [Doc. No. 122] at 12–14); *see also Madison v. Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (ruling that states do not waive their sovereign immunity as to damages actions under RLUIPA). The Court also dismissed Plaintiff's claims for injunctive relief, finding that those claims were mooted by Plaintiff's release from prison. *Id.* at 132. Thus, no claims remain in the instant action against Defendants in their official capacities, and Plaintiff's sole remedy is thus monetary relief.

3. Plaintiff alleges that several of his mailings to other prisoners were unconstitutionally "returned to sender" because several prison facilities require mail to be specifically addressed by dormitory. The Court takes up these allegations *infra* in Section IV–E–1 in its discussion of Plaintiff's challenge to several prisons' address labeling requirements (Claim 6).

claims against Defendants in their individual capacities. In view of Plaintiff's *pro se* status, the Court allowed Plaintiff to show cause as to why the Court should not treat Plaintiff's omission as a waiver or an abandonment of his individual-capacity claims. Plaintiff has since sought leave to correct his "typographical" error, by amending his Fourth Amended Complaint to include the word "individual" in place of or in addition to "official" where relevant. Plaintiff points out that, in all previous renditions of his Complaint, he has included claims against Defendants in their individual capacities, and has otherwise aggressively pursued those claims in his summary judgment papers.

Having considered the filings on this matter, the Court concludes that Plaintiff has made a sufficient showing that he did not abandon or waive his claims against Defendants in their individual capacities by omitting them from his Fourth Amended Complaint. Moreover, the Court finds that Defendants, who have fully briefed for purposes of summary judgment their defenses to Plaintiff's individual-capacity claims, and have otherwise conducted their efforts in this litigation consistent with an understanding that Plaintiff has maintained individual-capacity claims, will not be prejudiced by the Court granting Plaintiff leave to amend. The Court reads Plaintiff's Complaint to assert claims against Defendants in their individual capacities. Accordingly, Plaintiff's Motion to Amend his Complaint [245] is **GRANTED.**

Having resolved these preliminary matters, the Court turns to address the merits

of the parties motions for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn from it in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Individual Capacity Claims under RLUIPA

As an initial matter, the Court turns to examine whether RLUIPA authorizes Plaintiff to recover damages against Defendants in their individual capacities. In a previous Order, the Court examined this question and, while not definitively resolving it, tentatively concluded that RLUIPA permits suit against prison officials in their individual capacities.[4] *See*

4. The Court concluded that, "[i]n sum, this Court reads the RLUIPA to permit suit against state officials in their individual capacities." *Daker I*, 2006 WL 346440, at *10. But recognizing the emerging nature of RLUIPA jurisprudence, the Court withheld a final disposition of the issue. It explained:

In light of the nascent and emerging nature of RLUIPA jurisprudence, the Court does

not rule out the possibility that the reasoning expressed in some intervening decision might persuade it to depart from its current position. The arguments raised by Defendants to date, however, do not convince the Court that a more constrained reading of the RLUIPA[, namely, construing it to exclude claims against prison officials in their individual capacities,] is the correct one.

*Daker I,* 2006 WL 346440, at *10. Since the entry of that Order, however, the Court has had the occasion to consider a new argument, in part raised by Defendants, in support of their contention that RLUIPA does not authorize suits for monetary damages against individuals. After reconsidering the issue, the Court now concludes that, because construing RLUIPA to authorize individual damages actions would raise a substantial question concerning its constitutionality under the Spending and Commerce Clauses of the United States Constitution, the constitutional avoidance canon compels this Court to construe RLUIPA against authorizing such actions. Plaintiff's sole remedy at law, therefore, lies in 42 U.S.C. § 1983.

### A. Constitutional Avoidance Canon

 Under the canon of constitutional avoidance, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States,* 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)). In a more recent iteration of the rule, the Supreme Court has said that, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court." *Clark v. Martinez,* 543 U.S. 371, 380–81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005).

 The avoidance canon "rests upon our 'respect for Congress, which we assume legislates in the light of constitution-al limitations.'" *Harris v. U.S.,* 536 U.S. 545, 556, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (quoting *Rust v. Sullivan,* 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)). It is an "axiom of statutory interpretation," *Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440, 466, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), which "allows courts to avoid the decision of constitutional questions ... on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark,* 543 U.S. at 381, 125 S.Ct. 716 (citing *Rust,* 500 U.S. at 191, 111 S.Ct. 1759); *see also Public Citizen,* 491 U.S. at 466, 109 S.Ct. 2558 (stating that courts are "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils"); *United States v. Lovett,* 328 U.S. 303, 320, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1081, 90 L.Ed. 1252 (1946) (Frankfurter, J., concurring) ("[T]he most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible.").

 The avoidance canon applies only if two preconditions are met. First, the statute at issue must be ambiguous on its face. Thus, the canon "enters in only 'where a statute is susceptible of two constructions,'" *Penn. Dep't of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 535–536, 53 L.Ed. 836 (1909)), and "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001); *see also McConnell v. Federal Election Comm'n,* 540 U.S. 93, 180, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003)

*See id.* at *8 n. 7.

("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). Second, one construction of the statute must raise a sufficiently "serious question" regarding its constitutionality. *See, e.g., Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 523, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *cf. Almendarez–Torres v. United States*, 523 U.S. 224, 250, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (Scalia, J., dissenting) (stating that the doctrine "requires merely a determination of serious constitutional *doubt*, and not a determination of *unconstitutionality* ") (emphasis in original).

### B. The Text of RLUIPA Concerning Individual–Capacity Damages Actions

Having reviewed the contours of the constitutional avoidance canon, the Court turns first to examine whether Section 3 of RLUIPA is ambiguous regarding its authorization of suits for damages against officials in their individual capacities.

Congress enacted Section 3 of RLUIPA in part to provide enhanced protection to religious exercise in penal institutions. *See* 114 Stat. 804, 42 U.S.C. § 2000cc–1 *et seq.; see generally Cutter v. Wilkinson*, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Section 3 provides in pertinent part that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a). It applies insofar as a state prison institution "receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect,

commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc–1(b).

RLUIPA expressly provides for a private right of action for individuals whose religious exercise is unlawfully burdened while incarcerated in prison. *See* 42 U.S.C. § 2000cc–2. Accordingly, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." While § 2000cc–2 provides only that individual actions under RLUIPA may be brought "against a government," RLUIPA defines "government" as follows:

> (i) a State, county, municipality, or other governmental entity created under the authority of a State;

> (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

> (iii) any other person acting under color of State law.

42 U.S.C. § 2000cc–5(4).

Since the enactment of RLUIPA in 2000, no federal appellate court has yet addressed whether the provisions cited above authorize suit against an individual prison official in his or her individual capacity. *Cf. Lovelace v. Lee*, 472 F.3d 174, 196–99 & n. 7 (4th Cir.2006) (gathering district court cases). However, a division among district courts has emerged, with courts divided on the question. At least one early case, reasoning that RLUIPA only provided for an individual action against a "government," held that individual-capacity suits were foreclosed by its plain text. *See Hale O Kaula Church v. Maui Planning Commission*, 229 F.Supp.2d 1056, 1067 (D.Haw.2002) ("RLUIPA provides a cause of action against 'governments' and does not appear

to allow causes of action against individuals.").[5]

But several decisions handed down after *O Kaula Church* came to the opposite conclusion, noting that the reasoning expressed in *O Kaula Church* "misses the mark" because "government" is explicitly defined in RLUIPA as including a "person acting under color of State law." *See, e.g., Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1128, 1136 (E.D.Cal.2003). Relying on the "under color of" language, which parallels almost identical language in Section 1983, these courts have ruled, albeit with reservation, that RLUIPA permits individual-capacity suits for damages.[6] *See Daker I*, 2006 WL 346440, at *9–10 (concluding, though finding it an "unpalatable proposition," that individual-capacity suits were available under RLUIPA because its "under color of" language "tracks so closely" the language of § 1983); *Blount v. Johnson*, No. 7:04CV00429, 2006 WL 3746682, at *9–10 (W.D.Va. Dec. 18, 2006) (allowing RLUIPA claim to proceed against prison official in individual capacity after rejecting qualified immunity defense); *Shidler v. Moore*, 409 F.Supp.2d 1060, 1067, 1071 (N.D.Ind.2006) (recognizing RLUIPA damages claim against official in individual capacity); *Blount v. Johnson*, No. 7:04CV00429, 2006 WL 3746682, at *9–10 (W.D.Va. Dec. 18, 2006) (allowing RLUIPA claim to proceed against prison official in individual capacity after rejecting qualified immunity defense); *cf. Charles v. Verhagen*, 220 F.Supp.2d 937, 953 (W.D.Wis.2002) (appar-

ently recognizing RLUIPA claim for individual money damages but finding that prison officials were entitled to qualified immunity); *Ahmad v. Furlong*, 435 F.3d 1196, 1204 (10th Cir.2006) (discussing the availability of qualified immunity defense to RLUIPA individual-capacity claim but not explicitly addressing availability of damages).

Other courts, however, have been left unpersuaded that RLUIPA's definition of "government," by itself, indicates Congress' intent to provide for individual-capacity damages claims under RLUIPA. In *Smith v. Haley*, 401 F.Supp.2d 1240, 1246 (M.D.Ala.2005), for example, the court rejected this contention, concluding instead that RLUIPA's language concerning a "person acting under color of State law" merely indicated that a "government" could be held to account (in equity) for the acts of its officials under a *respondeat superior* theory. It explained:

> [B]ecause the term at issue is "government," the definitional words "official" and "other person acting under color of State law" could be reasonably read, and understood, to make clear that such person's actions would make the government for which he worked liable under RLUIPA, and thus the words could be read to mean that such person could be sued in his official, and not necessarily individual, capacity. Because there is simply nothing in the statute that clearly suggests that government employees can be liable for damages in their indi-

---

**5.** A more recent case has adopted similar reasoning. *See Morris–El v. Menei*, No. Civ.A. 00–200J, 2006 WL 1455592, at *3 (W.D.Pa. May 22, 2006) ("Further, RLUIPA does not contemplate recovering damages from individuals, such as the defendants. Instead, RLUIPA provides for 'appropriate relief against a government.' ").

**6.** One court, however, has gone farther and expressed confidently that "[c]learly the Act contemplates individual liability...." *Orafan v. Goord*, No. 00CV2022, 2003 WL 21972735, at *9 (N.D.N.Y. Aug.11, 2003).

vidual capacities, the court doubts that RLUIPA provides for such.

*Id.*

And other courts rejecting individual capacity claims under RLUIPA have emphasized that RLUIPA's provision for "appropriate relief" does not explicitly authorize a money damages remedy. *See, e.g., Boles v. Neet,* 402 F.Supp.2d 1237, 1241 (D.Colo. 2005) (finding plaintiff's damages claims under RLUIPA barred and stating that "it does not appear that the statute permits a claim for damages"); *cf. Gooden v. Crain,* 405 F.Supp.2d 714, 723–24 (E.D.Tex.2005) (initially stating that "RLUIPA does not contemplate recovering damages from individuals," but noting a lack of clarity on the issue and concluding that defendants, in any event, had qualified immunity); *Chase v. City of Portsmouth,* No. Civ. A. 2:05CF446, 2005 WL 3079065, at *5 (E.D.Va. Nov.16, 2005) (stating that "appropriate relief" under RLUIPA "may include injunctive and declaratory relief as well as nominal damages," but not discussing whether RLUIPA also authorizes compensatory damages); *Farrow v. Stanley,* No. Civ.02–567–PB, 2005 WL 2671541, at *11 n. 13 (D.N.H. Oct.20, 2005) (noting "substantial uncertainty . . . as to whether [RLUIPA] even provides a right to money damages," but declining to address issue because it had not been briefed by parties).

While RLUIPA shares its "under color of" language with § 1983, it is also distinct from § 1983 in one significant respect. Unlike RLUIPA, § 1983 explicitly provides for an award of monetary relief. *See* 42 U.S.C. § 1983 (providing that persons "shall be liable to the party injured *in an action at law,* suit in equity, or other proper proceeding for redress . . . .") (emphasis added). Absent explicit authorization, some courts have reasoned, it is far from clear that Congress intended RLUI-

PA to provide a legal remedy. *See, e.g., Boles,* 402 F.Supp.2d at 1241; *cf. Madison v. Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (concluding that, while states waive sovereign immunity for purposes of RLUIPA claims for equitable relief, the ambiguity presented by the terms "appropriate relief" forecloses claim that states have also waived sovereign immunity from suits for damages).

In view of both the uncertainty of RLUIPA jurisprudence and the absence of explicit authorization in RLUIPA for individual damages actions, the Court concludes that RLUIPA is susceptible of at least two "plausible statutory constructions." *See Clark,* 543 U.S. at 380–81, 125 S.Ct. 716. On the one hand, RLUIPA may be, and indeed has been reasonably construed to provide for individual damages actions against prison officials in their individual capacities. *See, e.g., Shidler,* 409 F.Supp.2d at 1067. But as other courts have held, it may also be reasonably read to foreclose such actions. *See, e.g., Boles,* 402 F.Supp.2d at 1241. And yet another "fairly possible" reading of RLUIPA is that, while individual capacity actions may be technically authorized under RLUIPA, the only "appropriate" remedy available in such actions is injunctive or declaratory relief. *Cf. Lovelace,* 472 F.3d at 196–99 (appearing to recognize, in denying prison official qualified immunity, that RLUIPA authorizes claims against prison officials in their individual capacities, but leaving open question of whether RLUIPA allows award of damages, and noting split among district courts). Faced with the various plausible interpretations, the Court concludes that RLUIPA is ambiguous on the question of whether it authorizes a private right of action seeking monetary damages against prison officials in their individual capacities.

## C. Constitutional Questions Raised by RLUIPA

Having concluded that the provisions of RLUIPA authorizing a private right of action are susceptible of multiple interpretations, the Court turns to examine whether a construction of RLUIPA authorizing individual damages actions would raise a "serious question" regarding the Act's constitutionality.

 It is a bedrock principle of our constitutional system of limited powers that "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *U.S. v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *see also M'Culloch v. Maryland*, 4 What. 316, 405, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819). The judicial authority to interpret and determine the constitutionality of laws "is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' " *City of Boerne v. Flores*, 521 U.S. 507, 516, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (quoting *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803)). Thus, laws enacted by Congress must rest on one of their enumerated or implied powers provided in Article I of the Constitution. *Id.*

By providing that RLUIPA applies insofar as a state prison institution "receives Federal financial assistance" or "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes," 42 U.S.C. § 2000cc–1(b), Congress explicitly relied on its powers under the Spending and Commerce Clauses of the Constitution in enacting RLUIPA. The Court considers Congress' authority to enact a damages action against individuals pursuant to RLUIPA under each of these constitutional provisions.[7]

**7.** Congress does not explicitly rely on Congress' Enforcement Power under Section 5 of the Fourteenth Amendment as authority for enacting RLUIPA, and probably for good reason. In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that Congress exceeded its Enforcement Power in enacting a law which, like RLUIPA, imposed greater protection on religious expression than the scope of protection provided by the First Amendment. Reasoning that "[l]egislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the [Fourteenth Amendment]," the Court ruled that the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488, was unconstitutional. *Id.* at 519, 117 S.Ct. 2157. Although RFRA, by purporting to apply to "every agency and official of the Federal, State, and local Governments," was much wider in scope than RLUIPA, much of the reasoning expressed in *City of Boerne* in striking down RFRA would appear to apply with equal force to Congress' authority to enact RLUIPA under its Enforcement Power. There, the Court explained:

> RFRA cannot be considered remedial, preventive legislation, if those terms are to

have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections. Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional.... Remedial legislation under § 5 should be adapted to the mischief and wrong which the Fourteenth Amendment was intended to provide against.

*Id.* at 532, 117 S.Ct. 2157 (citations and quotations omitted).

Like RFRA, Section 3 of RLUIPA, in effect, seeks "to attempt a substantive change in constitutional protections" of prisoners. *See id.* Thus, absent another source of constitutional authority, Section 3 of RLUIPA would raise a serious constitutional question if it were enacted only pursuant to Congress' power under Section 5 of the Fourteenth Amendment. *See Cutter*, 423 F.3d at 583 (noting that the concerns raised by *City of Boerne* are not present in RLUIPA because, unlike RFRA,

## 1. *Spending Clause*

■ Article I, Section 8, Clause 1 of the United States Constitution, commonly referred to as the Spending Clause, provides in pertinent part: "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States...." U.S. Const. art. I, § 8, cl. 1. Pursuant to its spending power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). Thus, "objectives not thought to be within Article I's 'enumerated legislative fields' may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Id.* (quoting *United States v. Butler*, 297 U.S. 1, 66, 56 S.Ct. 312, 80 L.Ed. 477 (1936)).

■ Typically, spending laws make an offer of federal funds to state institutions in return for the state's acceptance of specific conditions. Thus, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Absent such consent, however, Congress must draw authority to regulate state activity from a different constitutional source. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.*

■ Congress has enacted a number of spending laws, in addition to RLUIPA, which condition the award of federal funding on the funding recipient's willingness to subject itself to private rights of action seeking to enforce the conditions imposed by the legislation. For example, individuals may bring suits alleging race discrimination against state institutions under Title VI, 20 U.S.C. § 1681 *et seq.*, and may bring suits alleging sex discrimination under Title IX, 20 U.S.C. § 1681 *et seq.*, because both laws create a spending contract that conditions the award of funding on a state's waiver of sovereign immunity to individual suits. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 74–75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (concluding that Spending Power authorized Congress to create private right of action against state institution for intentional Title IX violation); *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (stating that Title VI and Title IX "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds"). A similar private right of action against state governmental institutions has been recognized under § 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, which was also enacted pursuant to Congress' spending power. *See*

it contains "a Commerce Clause underpinning or a Spending Clause limitation") (quoting *Cutter*, 544 U.S. at 715, 125 S.Ct. 2113); *see also Madison v. Riter*, 355 F.3d 310, 315 (4th Cir.2003) ("In passing RLUIPA, Congress

sought to avoid *Boerne's* constitutional barrier by relying on its Spending and Commerce Clause powers, rather than on its remedial powers under section 5 of the Fourteenth Amendment as it had in RFRA.").

*Consol. Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984); *see also Barnes v. Gorman,* 536 U.S. 181, 190 n. 4, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (stating that the Rehabilitation Act "*is* Spending Clause legislation" (emphasis in original)). It is therefore well within Congress' spending power to require state institutions, as a condition of accepting federal funding, to be subject to private liability for breaching the terms of the funding contact.

What is much less clear, however, is whether Congress may act pursuant to its spending power to authorize suits against *private individuals*—who are not parties to a federal funding contract—for violating the conditions imposed by spending legislation. To the contrary, the current understanding of Congress' spending power is at odds with the notion that Congress can regulate vis-á-vis pending legislation non-parties to a Congressional funding arrangement.

Demonstrating the limited reach of spending legislation, the Supreme Court has recognized on a number of occasions that non-recipients of federal funding, including state officials acting in their individual capacities, may not be subject to private liability under spending clause legislation. For example, in *U.S. Dept. of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the Supreme Court held that the obligations of § 504 of the Rehabilitation Act could not be applied to private airlines because they did not "actually receive federal financial assistance," and thus were not reached by the statute. While the Court relied on the text of the statute rather than on the limitations of Congress' spending power, it emphasized the contractual nature of the agreement, and noted that only "the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *Id.*

Similarly, in *NCAA v. Smith,* 525 U.S. 459, 468–69, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999), the Court held that the NCAA was not subject to liability under Title IX because it was a private entity that did not receive financial assistance. As in *Paralyzed Veterans,* the Court also relied on a plain reading of Title IX. In refusing to impose federal conditions on non-recipients of federal funding, however, both *NCAA* and *Paralyzed Veterans* reveal the structural—and necessarily constitutional—restrictions on Congress' spending power. That is, those who do not receive federal funds, and who are not part of a federal funding contract, may not be regulated pursuant to spending legislation. *See also Gebser,* 524 U.S. at 292, 118 S.Ct. 1989 (acknowledging that no individual capacity action could lie under Title IX against school teacher, but that "[o]ur decision does not affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in his individual capacity under state law or under 42 U.S.C. § 1983").

The circuit courts of appeal have been more explicit in their reliance on the limitations of the Spending Clause in declining to recognize individual-capacity suits under spending legislation. Addressing one such claim under Title IX, the Eleventh Circuit, in *Floyd v. Waiters,* 133 F.3d 786, 789 (11th Cir.1998), *vacated on other grounds,* 525 U.S. 802, 119 S.Ct. 33, 142 L.Ed.2d 25 (1998), *reinstated,* 171 F.3d 1264 (11th Cir. 1999), ruled that state officials could not be held individually liable under Title IX "because the contracting party is the grant-receiving local school district . . . and not an individual." *Id.* (quoting *Smith v. Metro. Sch. Dist. Perry Township,* 128 F.3d 1014, 1019 (7th Cir.1997)). Congress, the court reasoned, "intended Title IX to be a typical spending clause provision," and thus its conditions applied only to the recipients of federal funding. *Id.* (quoting

*Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1397 (11th Cir.1997) (en banc)); *see also Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir.1999) ("Individual school officials ... may not be held liable under Title IX."). In a more recent case, the Fourth Circuit also relied on the Spending Clause in reaching the same conclusion. *See Jennings v. Univ. of North Carolina*, 444 F.3d 255, 268 n. 9 (4th Cir.2006) ("Title IX was enacted pursuant to Congress' spending power and prohibits discriminatory acts by funding recipients. Because school officials are not funding recipients under Title IX, school officials may not be sued in their individual capacities under Title IX.").[8] Courts have rejected similar claims brought under the ADA and Rehabilitation Act against state officials in their individual capacities on spending-related grounds. *See Lollar v. Baker*, 196 F.3d 603, 608–09 (5th Cir.1999) (holding that a state official could not be subject to suit in individual capacity under the Rehabilitation Act because she was not a funding recipient); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) (no individual-capacity claims under ADA or Rehabilitation Act); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir.2002) (same); *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir.2001) (same); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999) (same).

Like Title VI, Title IX, the ADA, and the Rehabilitation Act, RLUIPA also invokes Congress' authority under the Spending Clause. *See* 42 U.S.C. § 2000cc–1 (b) (applying to any state prison institution which "receives Federal financial assistance"); *Benning v. Georgia*, 391 F.3d 1299, 1305–06 (11th Cir.2004) (holding RLUIPA a valid exercise of Congress' spending power). It is thus "much in the nature of a contract," and its "legitimacy ... rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School*, 451 U.S. at 18, 101 S.Ct. 1531. Consistent with this rationale, RLUIPA has been properly construed to authorize suits against funding recipients—namely, prisons institutions and their official representatives—because, by accepting federal funds, these funding recipients agree to be bound by the obligations imposed by RLUIPA. But the Court questions whether similar obligations could be imposed on private, non-party individuals to the funding arrangement.

Construing RLUIPA to provide for damages actions against individuals would raise a serious question as to whether Congress has exceeded its powers under the Spending Clause. By imposing liability on non-recipients of federal funding—individuals who are in essence involuntary and unknowing third parties to the funding

---

8. It appears that the circuit courts of appeals are in agreement that Title IX, because of its nature as spending legislation and its plain text, does not authorize suits against public officials in their individual capacities. *See Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1012–13 (5th Cir.1996) (concluding that Title IX only created cause of action for acts of grant recipients because, "[a]s an exercise of Congress's spending power, title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant," and "[t]he fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients"); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.1988) ("In implying a cause of action under Title IX, the Supreme Court has considered only actions against the educational institution itself. Accordingly, the separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX."); *Kinman v. Omaha Public School Dist.*, 171 F.3d 607, 611 (8th Cir.1999) (agreeing that "Title IX will not support an action against [a state official] in her individual capacity").

contract—RLUIPA would become an example of an unprecedented and untested exercise of Congress' spending power. There appears to be no historical basis (outside of the recent RLUIPA context) for recognizing individual-capacity damages claims under spending legislation.[9] It would likewise create significant tension with the Supreme Court's contract-based understanding of Congress' spending power. As such, the Court concludes that, insofar as it relies on the spending power, a construction of RLUIPA providing for individual liability would raise substantial constitutional concerns, and thus, absent justification in an additional source of constitutional authority, an alternative construction is favored.

### 2. Commerce Clause

Having concluded that construing RLUIPA to authorize damages actions against individuals would raise substantial constitutional concerns under the Spending Clause, the Court turns to examine whether such a construction would raise similar concerns under the Commerce Clause. The Court concludes that it would.

In addition to the Spending Clause, RLUIPA expressly invokes the Commerce Clause as a source of constitutional authority. *See* 42 U.S.C. § 2000cc–1(b) (RLUIPA applies insofar as "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes"). Because most courts have upheld RLUIPA on spending clause grounds, it appears that no court of appeals has yet addressed whether Section 3 of RLUIPA is a valid exercise of Congress' commerce power. *See Benning*, 391 F.3d at 1304 (upholding RLUIPA, as applied to state governments, as valid exercise of Congress' spending power, but declining to reach question of whether RLUIPA is valid exercise of commerce power); *Madison v. Virginia*, 474 F.3d 118 (4th Cir.2006) (same); *Cutter*, 423 F.3d at 584 (same); *Mayweathers v. Newland*, 314 F.3d 1062, 1068 n. 2 (9th Cir.2002) (same). *But cf. Charles v. Verhagen*, 348 F.3d 601, 609 & n. 3 (7th Cir.2003) (same, but noting as an aside that Wisconsin prison facility sends approximately 4,000 inmates to out-of-state

9. The Supreme Court has, however, recognized that the Necessary and Proper Clause contained in Article I, § 8, ¶ 18 extends the reach of the Spending Clause to authorize federal criminal laws which "keep a watchful eye on expenditures and on the reliability of those who use public money." *See Sabri v. United States*, 541 U.S. 600, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004). Thus, in *Sabri*, the Supreme Court upheld against Spending Clause challenge the federal bribery statute, 18 U.S.C. § 666(c)(2), which criminalizes bribery of state and local officials of agencies which accept federal funding. *Id.* at 610, 124 S.Ct. 1941. Noting that Congress had enacted the statute "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," the Court held that Congress properly acted within the ambit of the Necessary and Proper Clause to "bring federal power to bear directly on individuals

who convert public spending into unearned private gain." *Id.* at 607–08, 124 S.Ct. 1941 (citations and quotations omitted).

Unlike the federal bribery statute, however, Section 3 of RLUIPA does not seek to impose direct liability on those who unlawfully convert federal funds or who jeopardize the integrity of federal spending. Rather, a right of action against an individual under RLUIPA—while arguably justified as an attempt to ensure the proper spending of federal monies—bears a less direct connection to keeping a "watchful eye" over expenditures and public officials than an outright ban on bribery. Accordingly, at the very least, a question is raised regarding whether the imposition of private liability to enforce Section 3 of RLUIPA is "bound up with congressional authority to spend in the first place" such that it is consistent with the Necessary and Proper Clause. *See id.* at 608, 124 S.Ct. 1941.

facilities because of overcrowding and thus "certainly engages in interstate commerce to properly handle the requests for religious and other personal property from inmates housed outside Wisconsin").

■ Article I, Section 8 of the Constitution provides that Congress has authority "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Supreme Court has recognized three categories of activity that Congress may regulate under its commerce power. *Morrison*, 529 U.S. at 608–09, 120 S.Ct. 1740 (quoting *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)).

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

> *Id.* (citations and quotations omitted).

RLUIPA does not regulate the "channels" or "instrumentalities" of interstate commerce. Rather, it relies only on the third, "affecting-commerce" rationale of Congress' commerce power. *See* 42 U.S.C. § 2000cc–1(b) (providing that RLUIPA applies insofar as a "substantial burden [on religious activity] *affects*, or removal of that substantial burden *would affect*, ... commerce ... among the several states") (emphasis added).

The Supreme Court has, in a recent trilogy of cases, clarified the boundaries of the "affecting commerce" category of the Commerce Power. *See Lopez*, 514 U.S. at 549, 115 S.Ct. 1624; *Morrison*, 529 U.S. at 608, 120 S.Ct. 1740; *Gonzales v. Raich*,

545 U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005); *see also generally* DAN T. COENEN, CONSTITUTIONAL LAW: THE COMMERCE CLAUSE 64, 101–05 (2004) (providing overview of "affecting-commerce" category of Commerce Clause jurisprudence). In *Lopez*, the Court struck down the Gun–Free School Zones Act, a Congressional ban on the possession of firearms within a short distance of schools, finding that it "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however, broadly one might define those terms," and thus, could not be said to "affect" interstate commerce. *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624.

The Court revisited the affecting-commerce rationale in *Morrison*, 529 U.S. at 619–20, 120 S.Ct. 1740, in which it struck down the Violence Against Women Act ("VAWA"), which provided a private right of action to victims of gender-motivated violence. Finding that "the noneconomic, criminal nature" of the regulated conduct was "central" to its previous decision in *Lopez*, the Court held the conduct regulated by the VAWA was similarly noneconomic, and thus did not substantially affect interstate commerce. *Id.* As it did in *Lopez*, the Court refused to consider the aggregate effects of gender-motivated violence on interstate commerce to find support for the VAWA under the Commerce Clause. *Id.* at 617, 115 S.Ct. 1624.

But in *Raich*, the Court upheld the application of the Control Substances Act to concededly non-economic conduct in the face of a Commerce Clause challenge by private growers. and users of marijuana. 545 U.S. at 18, 125 S.Ct. 2195. There, the Court concluded that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate

market in that commodity." *Id.* at 18, 125 S.Ct. 2195 (citing *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). Thus, where Congress has a "rational basis" to regulate intrastate activity as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated," even where the regulated activity is concededly non-economic, the law may pass Commerce Clause muster. *Id.* at 22, 24, 125 S.Ct. 2195.

■■■■■ These cases have confirmed several propositions about the boundaries of Congress' Commerce power. First, any intrastate activity that Congress seeks to regulate must be "economic" in nature in order to be aggregated for purposes of determining its effect on interstate commerce. *See Morrison,* 529 U.S. at 613, 120 S.Ct. 1740 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). Secondly, noneconomic intrastate activity, which itself does not substantially affect interstate commerce, may nonetheless be the subject of a valid regulation if it is a part of a larger, more comprehensive scheme of commercial regulation. *See United States v. Evans,* 476 F.3d 1176 (11th Cir.2007) (citing *Raich,* 545 U.S. at 9, 125 S.Ct. 2195) (stating that *Raich* confirmed that Congress has "substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity"). And finally, noneconomic intrastate activity which is not regulated as a part of a greater scheme of comprehensive commercial regulation cannot be regulated under Congress' Commerce Power unless Congress has a "rational basis" for concluding that it *alone* "substantially affects" interstate commerce. *See Raich,* 545 U.S. at

22, 125 S.Ct. 2195; *United States v. Rodia,* 194 F.3d 465, 472–73 (3d Cir.1999) (stating that, in considering a facial commerce clause challenge, the focus is on "whether Congress had a rational basis for believing that [regulated activity] has a substantial effect on interstate commerce"); *United States v. Ballinger,* 395 F.3d 1218, 1226 (11th Cir.2005) ("Congress' power to regulate activities that 'affect' commerce enables it to reach wholly intrastate conduct-that is, conduct that utilizes neither the channels nor the instrumentalities of interstate commerce-but only when it has 'a substantial relation to' (meaning it 'substantially affect[s]') interstate commerce."); *United States v. Patton,* 451 F.3d 615, 633–34 (10th Cir.2006) ("Given that Mr. Patton's possession was not interstate, not commercial, and not an essential part of a comprehensive scheme of economic regulation, that his use of the bulletproof vest was in self-defense and not connected to crimes that might affect interstate commerce, and ... that the statute would be applied fewer than ten times a year, we find no rational basis for concluding that the possession of body armor prohibited by section 931 substantially affects interstate commerce."); *United States v. Maxwell,* 446 F.3d 1210, 1216 n. 6 (11th Cir.2006) (noting that *Morrison/Lopez* factors apply to a "single-subject statute whose single subject itself is non-economic" despite "potential confusion that may arise from the now unclear status ... post-*Raich*"); *cf. United States v. Forrest,* 429 F.3d 73, 78 (4th Cir.2005) ("[T]he Commerce Clause empowers Congress to regulate purely local intrastate activities, *so long as* they are part of an 'economic class of activities that have a substantial effect on interstate commerce.'" (citing *Raich,* 545 U.S. at 18, 125 S.Ct. 2195)); *Ballinger,* 395 F.3d at 1226 (Birch, J., dissenting) (stating that the Supreme Court's decisions in *Lopez* and *Morrison* recognize

that "federal regulation of intrastate activity must regulate activity that is *economic* in nature") (emphasis in original).

Having examined the limits of Congress's commerce power, the Court turns to examine whether Section 3 of RLUIPA, if construed to provide for a private right of action for monetary damages against officials in their individual capacities, would raise a substantial question as to whether Congress exceeded its power under the Commerce Clause.

As an initial matter, the Court questions whether the activity regulated by RLUIPA is economic in nature, such that it could be considered in the aggregate for purposes of determining its effect on interstate commerce. RLUIPA prohibits prison officials from unjustifiably interfering with the religious practices of institutionalized persons. To the extent that it were construed to create a private right of action against individuals, RLUIPA would restrict private interference with religious activity (under the color of state law, to be sure), and like the statute struck down in *Morrison*, entitle private individuals to seek redress for injuries caused by that conduct. Although the Court need not, and does not decide whether the conduct regulated by RLUIPA is "economic" under the Commerce Clause—or is conceivably so [10]—it is enough for purposes of the Court's present analysis that a substantial question exists whether RLUIPA "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however, broadly one might define those terms." *See Lopez*, 514 U.S. at 561, 115 S.Ct. 1624.

Second, RLUIPA does not appear to regulate activity as "a part of an economic 'class of activities' that have a substantial effect on interstate commerce," such that it could be justified by the comprehensive-

---

10. One might conceive of a situation in which the conduct regulated by RLUIPA could be characterized as "economic" in nature. For example, an affirmative obligation imposed by RLUIPA, such as requiring prison officials to make an accommodation to prisoners with religious dietary requests, could be potentially viewed as compelling an "economic" activity—*i.e.*, the purchasing of specialty foods. Or, more pertinent to the present case, a restriction on the mailing of a religious publication may arguably be characterized as "economic," by restricting or giving effect to an interstate transaction in religious material. Or, viewing the prison system with a wider lens, the interstate transfer of prisoners and their religious belongings may be viewed as affecting the "articles" of interstate commerce. *See Charles*, 348 F.3d at 609 & n. 3 (noting, after declining to address RLUIPA's constitutionality under the Commerce Clause, that the Wisconsin prison facility at issue in that case "sen[t] approximately 4,000 inmates to out-of-state facilities" because of overcrowding and thus "certainly engage[d] in interstate commerce to properly handle the requests for religious and other personal property from inmates housed outside Wisconsin").

But the Court in *Morrison* did not hypothesize about conceivable situations in which the Violence Against Women Act could be applied to gender-motivated violence which substantially affected interstate commerce, or to violence that occurred simultaneous to or concomitant with interstate travel. And the Court declined to view effects of the activity in the aggregate through a national lens. *See* 529 U.S. at 615, 120 S.Ct. 1740 (rejecting "a method of reasoning that ... seeks to follow the but-for causal chain from the initial occurrence of violent crime ... to every attenuated effect upon interstate commerce"). Rather, the Court focused its inquiry on the nature of the activity directly regulated by the statute, and on whether Congress had a rational basis for concluding the activity had a substantial effect on interstate commerce.

Thus, in light of the rationale of *Morrison*, this Court concludes—under the limited inquiry required by the constitutional avoidance rule—that a substantial question is raised regarding whether RLUIPA, if construed to provide a right of action against state officials in their individual capacities, regulates "economic" activity.

scheme rationale of *Raich.* 545 U.S. at 17, 125 S.Ct. 2195. Indeed, RLUIPA stands alone—enacted out of concern for the protection of religious expression on federal land and in prison institutions—and not as part of a greater scheme to regulate the sale of a commercial good or service.

Third, the Court questions whether RLUIPA—if it cannot be justified as an "economic" regulation or as an incidental regulation of intrastate non-economic behavior that is a part of a greater scheme to regulate economic conduct—regulates activity that *alone* substantially affects interstate commerce. To withstand scrutiny under this prong of the Commerce Clause analysis, Congress must have had a rational basis for concluding that the individual behavior regulated by RLUIPA alone substantially affects interstate commerce. For the reasons expressed above, the Court concludes that a substantial question would be raised regarding whether Congress had such a rational basis, if RLUIPA were construed to create a private right of action against individuals for money damages. *Cf. Cutter,* 544 U.S. at 715, 125 S.Ct. 2113 (noting that Court invalidated RFRA in *City of Boerne* because it "notably lacked a Commerce Clause underpinning").

Unlike the statutes at issue in *Morrison* and *Lopez,* however, RLUIPA contains a jurisdictional element or "hook," which purports to limit the scope of RLUIPA's applicability to the outer bounds of Congress' Commerce Power. *See* 42 U.S.C. § 2000cc–1 (b) (RLUIPA applies insofar as "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes"). Seizing on this purported limitation, two courts have suggested in dicta that any application of RLUIPA vis-vis Congress' Commerce Power would, by definition, be within constitutional bounds. *See Cutter,* 423 F.3d at 582 (stating "if the only jurisdic-

tional basis is the Commerce Clause, RLUIPA offers state officials the option of proving, as an affirmative defense, that the substantial burden on religious exercise—or the removal thereof—would not in the aggregate substantially affect interstate or foreign commerce."); *Mayweathers v. Terhune,* No. CIVS961582LKKGGHP, 2001 WL 804140, at *8 (E.D.Cal. Jul.2, 2001) (upholding RLUIPA against Commerce Clause challenge and stating that "[t]he jurisdictional element in § 3(b)(2) thereby ensures that Congress' Commerce Clause power is only exercised in those cases where interstate commerce is directly affected by the prison regulation at issue"), *aff'd on other grounds by Mayweathers v. Newland,* 314 F.3d 1062, 1068 n. 2 (9th Cir.2002) (declining to reach question of Congress' authority under Commerce Clause to enact Section 3 of RLUIPA after concluding Congress had authority under Spending Clause).

These cases, however, in the Court's view, do not resolve all doubts concerning RLUIPA's constitutionality under the Commerce Clause. Although the presence of a jurisdictional hook favors a finding of constitutionality, *see Lopez,* 514 U.S. at 549, 115 S.Ct. 1624 (noting the absence of a jurisdictional hook in striking down Gun–Free School Zones Act); *Morrison,* 529 U.S. at 608, 120 S.Ct. 1740 (noting same in striking down VAWA), it does not immunize Commerce Clause legislation from judicial scrutiny. *United States v. Peters,* 403 F.3d 1263, 1273 (11th Cir.2005) (stating that presence of jurisdictional element is not dispositive); *see also United States v. Patton,* 451 F.3d 615, 632 (10th Cir.2006) ("A jurisdictional hook is not, however, a talisman that wards off constitutional challenges.... The ultimate inquiry is whether the prohibited activity has a substantial effect on interstate commerce, and the presence of a jurisdictional hook, though certainly helpful, is neither necessary nor

sufficient."). Indeed, "where a jurisdictional element is required, a meaningful one, rather than a pretextual incantation evoking the phantasm of commerce, must be offered." *Maxwell,* 446 F.3d at 1217; *see also United States v. Corp,* 236 F.3d 325, 330–31 (6th Cir.2001) (same); *United States v. Wilson,* 73 F.3d 675, 685 (7th Cir.1995) ("[I]n *Lopez,* the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional."). *But cf. United States v. Hoggard,* 254 F.3d 744, 746 (8th Cir.2001) (appearing to hold that a jurisdictional hook immunizes a statute from Commerce Clause challenge in sustaining federal child pornography criminal statute because the "jurisdictional nexus is sufficient to place the statute beyond constitutional attack"). Despite the inclusion of a jurisdictional hook in RLUIPA, however, a question remains as to whether, if construed to create a private right of action against individuals for monetary damages, Congress had a rational basis for concluding that interference with religious activity in prison would alone substantially affect interstate commerce. The Court therefore remains convinced that a serious question would be raised as to its constitutionality under the Commerce Clause.

In sum, construing Section 3 of RLUIPA to provide a remedy against prison officials in their individual capacities would unmoor RLUIPA from its firm grounding in the Spending Clause, *see Cutter,* 544 U.S. at 715, 125 S.Ct. 2113, and engender debate about whether it regulates localized, noneconomic conduct that does not substantially affect interstate commerce. Such a construction may be in tension with the Supreme Court's modern understanding of the Commerce Clause, as expressed in *Morrison,* and thus raises serious constitutional concerns. Accordingly, to avoid

such a serious constitutional question, the Court concludes that Section 3 of RLUIPA does not authorize money damages actions against prison officials in their individual capacities.

## IV. Legal Standards Applicable to Plaintiff's ¶ 1983 Action

Having concluded that RLUIPA does not provide Plaintiff a basis to sue Defendants in their individual capacities for monetary damages, Plaintiff's exclusive legal remedy lies in § 1983. Plaintiff asserts violations of the First and Fourteenth Amendments pursuant to § 1983 against Defendants in their individual capacities. Before turning to examine Plaintiff's claims, the Court observes several overarching principles that guide its analysis.

### A. The *Turner* Analysis

It is well established that prisoners retain constitutional rights within prison walls. *See Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Prisoners are afforded protections under the free speech and free exercise provisions of the First Amendment, *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)), and the due process provision of the Fourteenth Amendment. *See Owen v. Wille,* 117 F.3d 1235, 1237 (11th Cir.1997). It is equally recognized, however, that "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Limitations on prisoners' exercise of constitutional rights "arise both from the fact

of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400.

■ To ensure that an appropriate balance is struck between the protection of fundamental rights and the deference owed to prison officials, the Supreme Court has determined that the constitutionality of prison regulations should be adjudged under a "reasonableness" standard. *Id.* at 349, 107 S.Ct. 2400. Under this test, a prison regulation "is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. The reasonableness approach "ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree.'" *O'Lone,* 482 U.S. at 349–50, 107 S.Ct. 2400 (quoting *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

■ In *Turner,* the Supreme Court provided four factors for courts to consider in determining the reasonableness of a challenged prison policy: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate; (3) what impact an accommodation of the asserted right will have on guards and other inmates; (4) and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns. *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254.

### B. Qualified Immunity

■ Defendants raise qualified immunity as a defense to Plaintiff's individual-capacity claims. Qualified immunity pro-

vides "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Its purpose is to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

■ Qualified immunity is a question of law for the court. *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993). To be entitled to qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee,* 284 F.3d at 1194. The burden then shifts to the plaintiff. *Lee,* 284 F.3d at 1194. There is a two-part test to determine whether a defendant is entitled to qualified immunity. First, a court asks "'whether [the] plaintiff's allegations, if true, establish a constitutional violation.'" *Vinyard,* 311 F.3d at 1346 (quoting *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Where the issue of qualified immunity is presented on summary judgment, the Court resolves all disputed facts in favor of the plaintiff, and it decides whether the supposed facts amount to a violation of Plaintiff's constitutional rights. *Purcell,* 400 F.3d at 1320 (11th Cir.2005). Second, after sufficiently stating a constitutional violation, a court must ask whether the right was "clearly established." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150

L.Ed.2d 272 (2001). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The salient question is whether the state of the law at the time of the alleged violation gave officials "fair warning" that their acts were unlawful. *Hope*, 536 U.S. at 740, 122 S.Ct. 2508; *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003); *see also Vinyard*, 311 F.3d at 1350–53 (articulating a tripartite analytical framework for ascertaining whether right is "clearly established").

■■■ While materially similar precedent or "broad statements of principle" can establish a right with sufficient clarity to deny an officer qualified immunity, they are not in all instances required to provide officials with the requisite notice. *See Vinyard*, 311 F.3d at 1350–52. In some cases, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* at 1350.

With these foundational principles in mind, the Court turns to examine the merits of Plaintiff's claims.

## V. Plaintiff's Individual Claims

### A. Stand–At–Attention Policy (Claim 1)

■■■ In his first allegation, Plaintiff attacks a prison policy requiring him to stand "at attention," stand up, or "lock it up" in the presence of prison officials. Plaintiff contends that requiring him to stand at attention contravenes the First Amendment by compelling him to speak against his religious and political beliefs. Relying on *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), Plaintiff argues that the GDC's stand-at-attention

policy is tantamount to mandating salutation of the American flag, and has no relation to any legitimate penological purpose.

Defendants respond by offering a number of justifications for their stand-at-attention policy. First, Defendants contend that prisoners must remain still during inspections or counts to ensure accurate identification and counting of prisoners. Second, Defendants contend that the stand-at-attention policy is a valid disciplinary procedure tailored to "instill a degree of respect for authority." And finally, Defendants contend that the stand-at-attention policy ensures the safety of prison officials, staff, and visitors who come into close contact with unrestrained prisoners.

Having reviewed the record, the Court concludes that Defendants' stand-at-attention policy is constitutional. Although Plaintiff may genuinely believe as a matter of faith that obeying an authoritative command to stand up and remain still constitutes an act of worship, Defendants have, in the Court's view, easily met their burden of demonstrating that the policy is reasonably tailored to the demands of prisoner discipline, safety, and identification. In stark contrast to *Barnette*, Plaintiff does not allege that he was required to perform a salutation, a bowed head, a bended knee, or any other "form of utterance" that "sign[s] his acceptance of the political ideas it thus bespeaks." *See* 319 U.S. at 632–33, 63 S.Ct. 1178. To the contrary, he was required to remain silent and still—and prohibited from such gesturing—to ensure security within the prison. Applying the first factor to be considered under *Turner*, the Court finds that the stand-at-attention policy is reasonably related to valid penological goals.

Moreover, the Court finds that the remaining *Turner* factors singularly favor

Defendants. As to the second factor, Plaintiff had ample alternative means to express his religious and political objections to the stand-at-attention policy and to otherwise express himself religiously. As to the third factor, it hardly must be said that the impact of allowing prisoners to ignore prison officials' commands to stand at attention would be dreadfully adverse to prison administration. And finally, there are no obvious alternatives to the stand-at-attention policy which might suggest that it is an "exaggerated response" to prison concerns. There is no constitutional violation.

Furthermore, the Court in not aware of any authority establishing an inmate's right to ignore a command by a prison official to stand up and remain stationary. Defendants are therefore entitled to qualified immunity. Accordingly, insofar as the parties move for summary judgment on Plaintiff's stand-at-attention claim (Claim 1), Defendants' Motion is **GRANTED** and Plaintiff's Motion is **DENIED**.

## B. Religious Headwear Restrictions (Claim 2)

In his second allegation, Plaintiff claims that he was unlawfully restricted from wearing a kufi, an article of Islamic headwear, which is a religious and spiritual expression of his Muslim faith. Prior to July 2005, inmates at GDC facilities were prohibited from wearing personal headwear outside of prayer meetings. Plaintiff claims that this restriction burdened his religious exercise without valid justification, and thus violated the First Amendment.[11]

Although Defendants now maintain a policy permitting inmates to adorn reli-gious headwear, Defendants defend their previous restriction on several grounds. First, Defendants contend that headwear is frequently associated with gang identification, and thus headwear restrictions reduce the likelihood of gang violence in prison. Second, Defendants contend that headwear may partially conceal the identity of certain prisoners and thus make it more difficult to identify prisoners. Finally, Defendants point out other safety concerns, including the risk that inmates will hide weapons or other contraband underneath their head garments.

The Eleventh Circuit has not yet considered a First Amendment challenge to a prison policy restricting religious headwear. Nevertheless, other courts have been virtually uniform in upholding no-headwear policies as reasonably related to security, disciplinary, and sanitary concerns. *See, e.g., Portley–El v. Zavaras,* 188 F.3d 519, 1999 WL 542631, at *2 (10th Cir. Jul.27, 1999) ("Because ... religious headgear may be used to conceal drugs, weapons, or other contraband, and may spark internal violence among prisoners, the wearing of such headgear poses a potential security threat and restricting its wear is entirely appropriate."); *Young v. Lane,* 922 F.2d 370, 375–77 (7th Cir.1991) (sustaining prohibition on wearing religious headwear in prison's general population as reasonably related to the prison's "strong interest in uniform dress regulations" and security); *Benjamin v. Coughlin,* 905 F.2d 571, 578–79 (2d Cir.1990) (sustaining prohibition on wearing of Rastafarian crowns); *Standing Deer v. Carlson,* 831 F.2d 1525, 1528 (9th Cir.1987) (upholding no-headwear policy as reasonably related to cleanliness, security, and

---

11. Because the Court has concluded that Plaintiff cannot bring a RLUIPA claim for monetary damages, and his RLUIPA claims for declaratory and injunctive relief are moot as the result of Plaintiff's release from prison, the Court has no occasion to consider the lawfulness of the Defendants' headwear restrictions under the more rigorous standard of RLUIPA.

safety); *Butler–Bey v. Frey,* 811 F.2d 449, 451 (8th Cir.1987) (rejecting inmate's claim that prohibition on wearing of fez violates First Amendment); *Rogers v. Scurr,* 676 F.2d 1211 (8th Cir.1982) (rejecting Muslim inmates' First Amendment challenge to policy forbidding religious headwear in prison's general population); *see also Nicholas v. Tucker,* 2001 WL 228413, at *2 (S.D.N.Y. Mar.8, 2001) (finding officer entitled to qualified immunity in claim brought alleging restrictions on inmate's wearing of kufi because "a reasonable officer ... could have concluded that a weapon or contraband could have been concealed under Nicholas' kufi") *vacated on other grounds,* 40 Fed.Appx. 642, 643 (2d Cir.2002); *cf. United States v. James,* 328 F.3d 953, 957 (7th Cir.2003) (Easterbrook, J.) ("The Constitution does not oblige the government to accommodate religiously motivated conduct that is forbidden by neutral rules, and therefore does not entitle anyone to wear religious headgear in places where rules of general application require all heads to be bare or to be covered in uniform ways").

In *Rogers v. Scurr,* for example, the Eight Circuit Court of Appeals rejected a challenge virtually indistinguishable from the one at issue in the present case. There, a Muslim prisoner challenged a prison policy that permitted prisoners to wear skullcaps only when attending religious ceremonies. 676 F.2d at 1215. The district court below held the policy violated the First Amendment because prison officials could adopt a less restrictive policy that allowed inmates to wear skullcaps in the prison's general population subject to reasonable searches. *Id.* The Eight Circuit, however, reversed, holding that the policy was "substantially warranted by the requirements of prison safety and order," and was an "eminently reasonable" attempt to restrict prisoner possession of contraband. *Id.* at 1215–16.

Here, Defendants have advanced the same reasons in support of the GDC's previous restrictions on headwear as were cited in *Rogers* and other cases in upholding no-headwear policies as reasonably related to valid penological interests. The Court finds those cases persuasive. It is further convinced by an application of the *Turner* factors that the regulation at issue does not run afoul of the First Amendment. First, the GDC's generally applicable restriction on headwear within its prison walls is reasonably related to security and identification. Second, Plaintiff was allowed to wear a Kufi during religious services, and thus had alternative means to express that aspect of his religious faith. Third, allowing prisoners to adorn religious headwear may undermine the prison's goals of security and identification, and lead to disciplinary problems within the prison. And fourth, the no-headwear policy was not an "exaggerated response" to GDC's security-related concerns.

In addition to failing to establish a constitutional violation, Plaintiff does not point the Court's attention to any case handed down by the Supreme Court, Eleventh Circuit Court of Appeals, or Georgia Supreme Court which clearly establishes a right to adorn religious headwear in prison. Accordingly, the Court concludes that Defendants are entitled to qualified immunity. Insofar as the parties move for summary judgment on Plaintiff's kufi-restriction claim (Claim 2), Defendants' Motion is **GRANTED,** and Plaintiff's Motion is **DENIED.**

### C. Content–Based Denial of Mail & Publications (Claims 3, 8)

▮ In his third and eighth allegations, Plaintiff claims that Defendants denied him approximately 52 books on the basis of content in violation of the First Amendment. These books include: (1) *The Cata-*

log of Catalogs VI; (2) *Mathematical Cryptology;* (3) *Applied Cryptography;* (4) *Using Microsoft Visual InterDev;* (5) *C++ How to Program;* (6) *Dubugging C++;* (7) *Night Movements;* (8) *Inside Kung–Fu;* (9) *Complete Karate;* (10) *Far Beyond Defensive Tactics;* (11) *SAS Training Manual;* (12) *The Encyclopedia of Survival Techniques;* (13) *The SAS Guide to Tracking;* (14) *Ninja: History and Tradition;* (15) *Ninja: Power of the Mind;* (16) *Ninja Mind Control;* (16) *Bin Laden: The Man Who Declared War on America;* (17) *Revolution by the Book; Different Loving;* (18) *How to Survive the IRS;* (19) *Witchcraft: A Secret History;* (20) *Practical Electronics;* (21) *Lip Reading Made Easy;* (22) *HansWehr Arabic English Dictionary;* (23) *Que Tal?;* (24) *C++ from the Ground Up;* (25) *Visual Basic from the Ground Up;* (26) *Ditch Medicine;* (27) *Do it Yourself Medicine;* (28) *The Mammoth Book of Love and Sensuality;* (29) *The Joy of Sex;* (30) *Building Bots;* (31) *Gonzo Gizmos;* (32) *Booby Trap Identification and Response Guide;* (33) *Death Investigator's Handbook and DEA Investigator's Manual;* (34) *Georgia Criminal Trial Practice;* (35) *Georgia Criminal Trial Practice—Forms;* (36) *Georgia Handbook on Criminal Evidence;* (37) *Green's Georgia Law on Evidence;* (38) *Criminal Investigation: Basic Perspectives;* (39) *Law Enforcement Technology 260: Criminal Investigation;* (40) *U.S. Army Special Forces Medical Handbook;* (41) *Military Book Club Emergency Medical Procedures;* (42) *The Tao of Sexuality;* (43) *Ragnar's Guide to the Underground Economy;* (44) *Investing Offshore;* (45) *Electronic Circuits and Secret of an Old–Fashioned Spy;* (46) *The Black Science: Ancient and Modern Techniques of Ninja Mind Control;* (47) *The Kama Sutra;* (48) *Samurai: The World of the Warrior;* (49) *Leadership Lessons of the Navy Seals;* (50) *Experiments in Electronic Devices and Circuits;* (51) three *Fanta-*

*graphics* books; and (52) *Guide to Getting it On.* (*See* Pl.'s Statement of Material Facts [hereinafter "Pl.'s SMF"] ¶¶ 15–59.)

Defendants do not dispute that they denied Plaintiff these books. Rather, Defendants argue that Plaintiff has failed to demonstrate that he followed the proper procedures in requesting the books, and that, in any event, the books were properly denied on procedural grounds or after a review by a publications review panel. Defendants claim they are therefore entitled to qualified immunity, notwithstanding the reasons for the denial of each individual publication.

■ Regulations affecting the sending of publications to a prisoner are analyzed under the *Turner* reasonableness standard. *Thornburgh,* 490 U.S. at 413, 109 S.Ct. 1874 (citing *Turner,* 482 U.S. at 89, 107 S.Ct. 2254). Such regulations are valid if they are reasonably related to legitimate penological interests. *Id.* In *Thornburgh,* the Supreme Court held facially constitutional a federal prison policy authorizing a prison warden to deny prisoners certain publications pursuant to specified guidelines, but remanded the case for consideration of the plaintiffs' individual as-applied challenges to the denial of 46 books. *Id.* at 403–04, 109 S.Ct. 1874. The regulations upheld in *Thornburgh* required the prison warden, in determining whether to exclude a specified publication, to consider whether the challenged publication was "detrimental to the security, good order, or discipline of the institution or … might facilitate criminal activity." *Id.* at 416, 109 S.Ct. 1874 (quoting 28 C.F.R. §§ 540.70(b); 540.71(b)). The guidelines also provided several criteria for rejection, including whether the publication "depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices," "depicts, encourages, or describes methods of escape from correctional facilities," "is written in code," "de-

picts, describes or encourages activities which may lead to the use of physical violence or group disruption," "encourages or instructs in the commission of criminal activity," or is "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." *See id.* (quoting 28 C.F.R. § 540.71(b)). The warden could not, however, reject a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular·or repugnant." *Id.* Finding that "considerable deference" should be afforded to "prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world," *id.* at 408, 109 S.Ct. 1874, the Court concluded that the policy was facially constitutional. Nevertheless, the Court remanded the prisoner's as-applied challenge to the district court to determine whether the warden had validly applied the guidelines to each denial of the 46 publications. *Id.* at 419, 109 S.Ct. 1874.

Following *Thornburgh,* lower courts have similarly afforded considerable latitude to decisions by prison officials to exclude certain publications from prisoners on the basis of content. *See McCorkle v. Johnson,* 881 F.2d 993, 995 (11th Cir.1989) (finding content-based restriction on satanic materials withstood First Amendment scrutiny because "[i]t is an informed and measured response to the violence inherent in Satan worship, and to the potential disorder that it might cause within the prison"); *Thompson v. Patteson,* 985 F.2d 202, 206 (5th Cir.1993) (upholding prison regulation which prohibited materials that prison officials found would encourage deviate sexual behavior); *Amatel v. Reno,* 156 F.3d 192, 193 n. 1, 195–204 (D.C.Cir. 1998) (upholding ban on distribution of all commercial material that "is sexually explicit or features nudity" as reasonably related to goal of rehabilitation, and stat-

ing that "[f]or judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative"); *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (applying "heightened deference" to prison official's decision to censor a book concerning financial advice and finding no constitutional violation); *cf. Abernathy v. Cunningham,* 393 F.2d 775, 779 (4th Cir.1968) (finding a restriction on religious magazines constitutional in light of "considered opinion of the prison authorities that such material ... would, in this setting, be inflammatory and subversive of discipline").

In *Duamutef v. Hollins,* for example, a prisoner brought suit claiming a prison official violated the First Amendment by censoring a book providing investment advice, entitled *Blood in the Streets: Investment Profits in a World Gone Mad.* 297 F.3d at 110. In addition to being censored, the publication triggered prison officials to institute a strict mail watch on the plaintiff's mailings for a temporary period. *Id.* The prisoner challenged the exclusionary decision and the resulting mail watch. The district court, noting that the prison officials had conceded that the publication was a "harmless economics book," concluded that the prison officials had violated the First Amendment and were not entitled to qualified immunity. *Id.* at 111. On appeal, however, the Second Circuit reversed, ruling that, in light of the plaintiff's disciplinary history and the "paramount importance of exercising caution in matters of prison security," no rational jury could find that the censorship decision and resulting mail watch was not reasonably related to legitimate penological interests. *Id.* at 113. Significantly, the court endorsed the prison officials' decision to exclude the publication at issue based on its "title alone," explaining:

> It is true that the publication that sparked their decision to institute the mail watch was a harmless economics

book. A title containing the phrase "Blood in the Streets," however, could arouse concern in any reasonable prison official. Even if, as the district court suggested, a jury could find that a more thorough examination of the book would have assuaged such concerns, we find that it is generally sufficient for a prison official to base a security decision on the title alone. Considering the limited resources of prison systems and the intense pressure to prevent security problems, we cannot expect more of corrections personnel in most circumstances. *Id.*

Not all books requested by prisoners, however, may be judged by their covers. Where a prison official's denial of a publication is unreasonable, and the prison official provides no other content-neutral basis for the denial, courts have found a constitutional violation. *See, e.g., Sutton v. Rasheed*, 323 F.3d 236 (3d Cir.2003) (concluding denial of Nation of Islam religious books was unconstitutional but defendants were nonetheless entitled to qualified immunity); *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir.1987) (addressing a "ban" of Church of Jesus Christ books touting white supremacy from a prison library and holding "literature advocating racial purity, but not advocating violence or illegal activity as a means of achieving this goal, and not so racially inflammatory as to be reasonably likely to cause violence at the prison, cannot be constitutionally banned as rationally related to rehabilitation"); *Brown v. Peyton*, 437 F.2d 1228, 1232–33 (4th Cir.1971) (concluding, in a case challenging denial of several religious magazines that court had previously held could validly be restricted, that a plenary hearing should nevertheless be conducted to determine whether a denial of the current issue of magazine could be justified).

As an initial matter, Plaintiff does not bring a facial challenge to the GDC's publication review procedures. Rather, Plaintiff individually challenges each of the alleged 52 denials of publications, which span such topics as foreign language education, writing in shorthand, computer programming, criminal law, technological invention, martial arts, military tactics, crime scene investigation, witchcraft, sexual performance, and tax collection.

Defendants do not dispute the list of books that Plaintiff claims were denied, and apparently concede that at least certain publications were denied on the basis of content. Without providing further detail, however, Defendants contend that any books denied based upon content were not denied "without a review of the books." (*See* Defs.' Resp. to Pl.'s Mot. for Summ. J. at 9.) Defendants further state that, in any event, "[n]early all of Daker's books and publications denials have entailed procedural errors on his part or his failure to comply with mandatory procedure requirements under the Department of Corrections' SOPs or book quantity infractions." (*See id.*) But besides denying Plaintiff's allegations generally, Defendants do not provide any evidence or argument regarding each of the alleged 52 denials of publications, or the reasons underlying any denial based on content.[12] Indeed, in their Response to Plaintiff's Statement of Material Facts, Defendants merely "dispute

---

12. Defendants have, however, albeit only in their response to Plaintiff's Statement of Material Facts, defended the denial of certain books on the basis of content. For example, Defendants state that the book *Witchcraft: A Secret History* "was denied due to pornographic or nude pictures." (*See* Defs.' Resp. to Pl.'s SMF ¶ 29.) Plaintiff responds that

"[t]he book does not promote nudity but one of the photos in the book depicted an exposed breast." (Pl.'s SMF ¶ 29.) It also appears that Defendants admit that Defendant Donald Harris "confiscated an issue of National Geographic magazine because it depicted some tribal women with their breasts exposed," (*see* Pl.'s SMF ¶ 33; Defs.' Resp. to Pl.'s SMF

[Plaintiff's] allegations as written," (*see, e.g.,* Defs.' Resp. to Pl.'s SMF [241] at ¶¶ 38–39, 41–44, 46, 54, 55), or respond that certain of Plaintiff's requested materials were "contraband . . . which [Plaintiff] had thirty days to dispose of," (*see, e.g.,* Defs.' Resp. to Pl.'s SMF [241] at ¶¶ 49–51, 53), but provide no record citations to evidence.

 A cursory review of the titles of the publications at issue establishes that at least certain of the denied books contain objectionable material that could be constitutionally restricted from prisoners on the basis of "title alone." *See Duamutef,* 297 F.3d at 110. Neither prison officials nor the Court need to prod the pages of *The SAS Guide to Tracking* or *Booby Trap Identification and Response Guide* to find firm constitutional footing to exclude them from a prisoner's possession. Nonetheless, Defendants have utterly failed to provide the Court with any explanation regarding the reasons for its denials of each of Plaintiff's 52 books. Besides Plaintiff's sworn allegations that these books were denied on the basis of content (and in some cases without notice or an opportunity to appeal), the present record is bereft of factual detail regarding the actual reasons—whether procedural or content-based—underlying Defendants' decision to deny Plaintiff each of these 52 books. Rather than addressing Plaintiff's individual allegations, Defendants argue that Plaintiff has failed to demonstrate that he properly requested the books at issue and complied with appropriate procedures. Although Defendants are correct that the final burden to prove a constitutional violation is on Plaintiff, Plaintiff has come forward with evidence in the form of affidavits and grievance forms that the alleged 52 publications were denied on the basis of content. To be entitled to summary judgment, Defendants must respond by producing evidence that demonstrates that each challenged denial was reasonably related to valid penological interests and comports with the other three *Turner* factors.[13] *See Thornburgh,* 490 U.S. at 419, 109 S.Ct. 1874 (remanding for individual challenges to denials of 49 books); *Beard v. Banks,* —— U.S. ——, ——, 126 S.Ct. 2572, 2576, 165 L.Ed.2d 697 (2006) (plurality) (awarding summary judgment to prison officials because "prison officials have set forth adequate legal support for the policy" of denying prisoner publications); *id.* at 2581 ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."); *see also Myron v.*

¶ 33), and denied the books *Mammoth Book of Love and Sensuality, The Joy of Sex, The Tao of Sexology,* and the *Guide to Getting it On* because each "depicted nudity and sexually explicit conduct." (*See* Pl.'s SMF ¶¶ 40, 45, 55; Defs.' Resp. to Pl.'s SMF ¶¶ 40, 45, 55). Defendants also admit that Defendant Hilton Hall excluded the books *Building Bots* and *Gonzo Gizmos* "because [they] threaten the security of the prison by providing information on how to build weapons." (*See* Defs.' Resp. to Pl.'s SMF ¶ 47.)

But Defendants' bare assertions in their Response to Plaintiff's Statement of Material Facts, which contain no citations to the record or any grounding in affidavits or other evidence, cannot validate the denials of Plaintiff's publications. Because Defendants have not attempted in their summary judgment papers to defend—or for that matter, even address—their reasons for denying these publications, and have not discussed their policies for denying materials containing nudity, electronics, or weapons, the Court is unable, on the present *record,* to resolve the validity of the denial of these books to Plaintiff.

13. Local Rule 56.1 also requires that Defendants respond with citations to evidence disputing facts alleged by Plaintiff. *See* L.R. 7.1.(A)(1) NDGa. ("Every motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority. If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law.").

*Terhune,* 196 Fed.Appx. 601, 604 (9th Cir. 2006) (reversing district court's dismissal of prisoner's First Amendment claims because "the record does not yet contain any justification for the restriction"); *cf. Jean v. Nelson,* 727 F.2d 957, 983–84 (11th Cir. 1984) (reversing and remanding First Amendment challenge to prison regulations because the "district court will clearly need to hear evidence on these matters to arrive at the proper balance between the government's interest in security and the [plaintiff's] interest in exercising its first amendment rights."). Because the Court finds that the present record provides an insufficient basis to award either party judgment as a matter of law, the Court declines to award summary judgment on this claim until hearing from the parties further.[14] Accordingly, insofar as they relate to Claims 3 and 8 of Plaintiff's Complaint, Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's Motion for Summary Judgment is **DENIED.** If appropriate, the Court will allow the parties an opportunity to renew their motions after holding a hearing on this matter as provided in more detail below.

### D. Procedural Due Process Claims (Claims 4, 7, 14)

■ Plaintiff also alleges that Defendants denied him notice and an opportunity to appeal numerous decisions to deny him mail (Claim 4) and the list of publications provided above (Claim 7 and 14).

■ Prisoners are entitled to "minimum procedural safeguards" in the context of such decisions, *see Procunier v. Martinez,* 416 U.S. 396, 417, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh,* 490 U.S. at 413–14, 109 S.Ct. 1874, and in this Circuit such due process protections entail: "(1) appropriate notice, (2) a reasonable opportunity to challenge the initial decision, and (3) an ultimate decision by a disinterested party not privy to the initial censorship decision." *Guajardo v. Estelle,* 580 F.2d 748, 762 n. 10 (5th Cir.1978).[15] Plaintiff argues that, while GDC Operating Procedures ostensibly require notice, an opportunity to appeal, and a determination by a disinterested party, these procedures were not followed at the institutions in which he has been incarcerated.

By previous Order, the Court concluded that Plaintiff was entitled to preliminary injunctive relief on his procedural due process claims. (*See* Order of Aug. 15, 2005 at 20.) The court found that Plaintiff had presented "voluminous evidence," in addition to Defendants' own admissions, that Defendants had not provided him with the requisite procedural due process upon de-

---

14. Plaintiff's alleged instances of content-based denials of publications date back to August 1997. It would appear that a number of his claims are barred by the two-year statute of limitations respecting § 1983 claims. Plaintiff filed his case on August 18, 2003. Under Georgia's statute of limitations, claims that arose prior to August 18, 2001 would likely be precluded. *See Porter v. Ray,* 461 F.3d 1315, 1323 (11th Cir.2006) (applying Georgia's two-year statute of limitations, O.C.G.A. § 9–3–33, to claims brought under ¶ 1983).

Although Defendants discuss the statute of limitations in their response to Plaintiff's Statement of Material Facts (*see* Defs.' Response to Pl.'s SMF [241] ¶ 8), Defendants failed to raise the statute of limitations as defense in their summary judgment papers. The Court will nevertheless allow Defendants to raise this issue with the Court at the subsequent hearing, where Plaintiff will be afforded a proper opportunity to respond.

15. The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

nying him mailings or publications. (*See id.*)

Defendants contend that "when books or publications are denied for reasons other than content an inmate is not eligible to appeal its denial to the Publication Review Committee." Nonetheless, Defendants do not respond directly to Plaintiff's alleged instances of procedural due process infractions, instead stating in sweeping terms that "[n]early all of Daker's books and publications denials have entailed procedural errors on his part or his failure to comply with mandatory procedure requirements ... or book quantity infractions." (*See* Defs.' Resp. to Pl.'s Mot. for Summ. J. [242–1] at 9.)

For example, Plaintiff contends that on May 28, 2003, Defendant Benton denied Plaintiff mail from Plaintiff's brother which contained a copy of the Post Office rates and fees chart that was downloaded from the internet. "The material was rejected and destroyed without written notice to Daker, documentation of the rejection ... and without either Daker or his brother being given an opportunity to appeal." (*See* Pl.'s SMF ¶ 27; 23rd Aff. Daker ¶ 27.) While Defendants "dispute as written" Plaintiff's allegation, Defendants offer no specific evidence refuting Plaintiff's allegations, and do not state that proper notice or an opportunity to respond was afforded to Plaintiff. (*See* Defs.' Resp. to Pl.'s SMF ¶ 27.)

As another example, Plaintiff claims that on October 26, 2004, two books, *The Ninja* and *Endurance Techniques,* were denied to Plaintiff. He claims that he was initially denied an opportunity to appeal, but after filing a grievance relating to that denial, Plaintiff was ostensibly given an opportunity to appeal. Nevertheless, Plaintiff alleges that Defendant Hilton Hall "refused to impound the publication for review by the [Publications Review Committee]." After Plaintiff filed another grievance relating to the denial of an opportunity to appeal, Defendant Steve Benton rejected the appeal, stating "only if the facility cannot determine admissibility is the publication to be impounded for further review by the PRC." (*See* Pl.'s SMF ¶ 46.) Once again, Defendants "dispute these allegations as written," without providing any argument or citation to evidence in the record. (*See* Defs.' SMF ¶ 46.)

Furthermore, Defendants admit that in February 2005, Plaintiff received from a publisher the books *Criminal Investigation: Basic Perspectives* and *Law Enforcement Technology' 260 Criminal Investigation.* Defendants also admit that, after denying Plaintiff these books, Plaintiff was not provided an opportunity to appeal their denial. While not providing any argument on the issue in their summary judgment papers, Defendants state that the reason provided to Plaintiff for the denial was "the appeals process did not apply because the books were not weekly or monthly publications." (*See* Defs.' Resp. to Pl.'s SMF ¶ 52.)

Plaintiff also claims that after Defendants denied three catalogs from *Fantagraphics* Books, he requested to appeal the decision to the Publications Review Committee. Plaintiff alleges that he was denied the opportunity to appeal that decision because "it doesn't matter, Capt Jones said you can't have them because they have nudity." (*See* Pl.'s SMF ¶ 58.) After being denied the book *Guide to Getting it On* for similar reasons, Plaintiff again claims being denied an opportunity to appeal, to which Defendant Benton responded, "I don't want to hear it. You go home next week." (*See id.* ¶ 59.)

█ Having reviewed the record, the Court finds that it provides an insufficient basis to award either party judgment as a matter of law at the present time. *See Myron,* 196 Fed.Appx. at 604 (reversing

district court's dismissal of prisoner's First Amendment claims because "the record does not yet contain any justification for the restriction"); *Jean*, 727 F.2d at 983–84. Plaintiff has asserted numerous instances of denials of opportunities to appeal rejections of mailings and publications by Defendants. A dispute of material facts remains as to these claims. Furthermore, the Court finds that the law of *Guajardo v. Estelle* clearly established the procedural due process requirements of the content-based denial of prisoner mailings and publications.[16] Accordingly, insofar as they relate to Claims 4, 7, and 14 of Plaintiff's Complaint, Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's Motion for Summary Judgment is **DENIED**.[17] If appropriate, the Court will allow the parties an opportunity to renew their motions after holding a hearing on this matter as provided in more detail below.

### E. Challenges to Other Mailing and Publication Restrictions (Claims 6, 10, 11, 12, 13, 15, 16, 17)

Plaintiff challenges various other prison policies he claims were maintained during his incarceration by Defendants in violation of the First and Fourteenth Amendments. But before turning to the specifics of Plaintiff's allegations, the Court observes several limitations on the scope of its analysis of these claims.

Plaintiff has been released from prison, and his claims for equitable and

---

16. As stated, Defendants argue that the denial of mail or publications for content-neutral reasons does not trigger the procedural protections of *Guajardo*. The Court finds that the present record does not provide a basis for the Court to consider this argument. Defendants are free, however, to raise it at the subsequent hearing.

17. To the extent that Plaintiff asserts that several of his books were destroyed by Defendants in violation of the Fourteenth Amendment when Plaintiff was transferred to other prison institutions, those claims fail as a matter of law. (*See* Pl.'s SMF ¶¶ 28 (discussing destruction of *Al–Kutub As–Sitah, Index–Cum–Concordance of the Holy Qur'an, The Prisoner's Guide to Survival;* and *Abnormal Psychology*); 91–94; 99–101.) The Supreme Court has held in two cases that property deprivations by prison officials do not implicate the Fourteenth Amendment if caused by a negligent act, *see Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986), or if caused by an intentional deprivation by a prison employee where the state has provided a meaningful post-deprivation remedy for the loss. *Hudson v. Palmer*, 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984). Here, the Georgia Tort Claims Act, *see* O.C.G.A. § 50–21–20 *et seq.*, and Georgia's law of trover and conversion, *see* O.C.G.A. § 51–10–1 provide a constitutionally adequate remedy to redress the destruction of personal property by a state officer. The availability of those remedies precludes Plaintiff's claim that he was intentionally deprived of his property without due process. *See Grant v. Newsome*, 201 Ga.App. 710, 411 S.E.2d 796, 797–98 (1991) (finding O.C.G.A. § 51–10–1 and O.C.G.A. § 9–11–69 are adequate post-deprivation remedies that preclude prisoner's due process claim alleging property loss); *see also Byrd v. Stewart*, 811 F.2d 554, 555 n. 1 (finding that Georgia "has provided an adequate post deprivation remedy when a plaintiff claims that the state has retained his property without due process of law"); *Langbehn v. Henderson*, No. 06–CV–3019–TWT, 2007 WL 30602, at *3 (N.D.Ga. Jan.2, 2007) (same); *Thompson v. Brogden*, No. 7:06–CV–91–HL, 2006 WL 2793160, at *3 (M.D.Ga. Sep.26, 2006) (same); *Price v. Busbee*, No. 5:04–CV–313–CAR, 2006 WL 435670, at *4 (M.D.Ga. Feb.21, 2006) (concluding that Georgia Tort Claims Act provided adequate post-deprivation remedy to prisoner and thus precluded claim that theft by officials of a list of phone numbers and personal mail constituted violation of due process). Furthermore, by Plaintiff's own allegations, it appears that Plaintiff was afforded an opportunity to aggrieve the destruction of these books, and "DGC acknowledged the violation, and the loss of the books, but held that monetary compensation was not available." (*See* Pl.'s SMF ¶ 28.)

declaratory relief have become moot. *See McKinnon v. Talladega County*, 745 F.2d 1360, 1363 (11th Cir.1984) ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.") Plaintiff is therefore limited to retrospective relief for "alleged past wrongs." *Id.* at 1362. This Court's previous dismissal of Plaintiff's injunctive claims "left only a damages claim based on application of the regulations to plaintiff's particular situation." *Wardell*, 470 F.3d at 954. Plaintiff may not bring a facial challenge to Defendants' prison policies because any interest he had in a court declaration of unconstitutionality has become moot. *See Howard v. Whitbeck*, No. 05–2368, 2007 WL 29179, at *2 (6th Cir. Jan.5, 2007) ("Because Howard has been released on parole and the Michigan statute does not apply to parolees, any such declaration or injunction would not make a difference to Howard's current legal interests. Accordingly, Howard's appeal is moot."); *Wardell*, 470 F.3d at 954. "Although the complaint suggests a broad facial attack on the regulations prohibiting gift purchases of subscriptions and the like, the case has been narrowed substantially due to a mootness consideration," and is therefore "limited to plaintiff's claim for damages based on particular instances in which enforcement of the challenged prison regulations allegedly interfered with his constitutional rights." *Id.*

With this in mind, the Court turns to address Plaintiff's purported challenges to various GDC prison policies.

### 1. *Address Requirements* (Claim 6)

In his sixth allegation, Plaintiff alleges that two letters he sent to other prisoners were returned to him stamped "returned to sender" in violation of the First and Fourteenth Amendments. (*See* Pl.'s St. of Mat. Facts ¶ 34; 64–67.) Plaintiff claims that the prisons to which he sent these letters maintained an unconstitutional policy requiring the name or number of the dormitory in which a prisoner resided to be included as a part of the address label in order for mail to be delivered to that prisoner.

 As stated, Defendant no longer has standing to challenge the facial validity of the mail-labeling requirement. Rather, he must allege and prove specific instances of the unconstitutional denial of his mailings in order to recover damages on his claims. In the Court's view, Plaintiff's two allegations concerning returned mail do not rise to the level of colorable constitutional violations, absent evidence that Plaintiff's mailings were denied arbitrarily or on the basis of content. In addition, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable for money damages. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988). Plaintiff has not alleged that any of the named Defendants were involved in any decision to reject Plaintiff's mail for failing to address it appropriately.

 In any event, Plaintiff has failed to demonstrate the existence of any clearly established right to send another prisoner mail without addressing it specifically by dormitory.[18] Accordingly, Defendants

---

18. Rather, the weight of authority favors upholding non-arbitrary restrictions on inmate-to-inmate communications. *See Vester v. Rogers*, 795 F.2d 1179, 1183 (4th Cir.1986) (upholding prison policy which required permission of warden before allowing prisoners to communicate by mail with prisoners in other institutions as reasonably related to the state's "need to impose a limit on the flow of information between inmates as a means of reducing institutional tensions and impeding the exchange of communication relating to unlawful activity"); *Thornburgh*, 490 U.S. at 412, 109 S.Ct. 1874 (noting that material which circulates within prison walls may has "potential for coordinated disruptive conduct and thus 'it is essential that prison officials be

have qualified immunity and Plaintiff may not recover monetary damages on these claims. Defendant's Motion for Summary Judgment on Claim 6 is **GRANTED** and Plaintiff's Motion is **DENIED**.

### 2. *Payment Requirements/Ban on Gift Publications* (Claims 10, 11)

■ In his tenth and eleventh allegations, Plaintiff claims that Defendants maintain an unconstitutional policy requiring that prisoners pre-pay out of their own prison accounts for publications they receive by mail from book dealers. Plaintiff claims that this policy effectively disallows third parties, such as family members, from paying for publications. He challenges both the requirement that publications be pre-paid (Claim 11) and the alleged ban on gift publications (Claim 10). Defendants defend their pre-paid requirement as constitutional and deny that they maintain a ban on gift publications.

As an initial matter, most, if not all, courts have upheld prison policies requiring that publications received by inmates be prepaid. *See Rodriguez v. James*, 823 F.2d 8, 11–12 (2d Cir.1987) (upholding prison regulation allowing inspection of prisoner's business mail on grounds that inspection was "intended to limit the monetary obligations assumed by inmates and to require that inmates prepay for items ordered by the mail"); *see also Lena v. DuBois*, No. 93–1924, 1994 WL 99940, at *1 (1st Cir. Mar.23, 1994) (upholding "rule[ ] barring the receipt of publications, ordered through the mail, that have not been paid for in advance"); *Gardner v. Dalimonte*, No. M87–211 CA3, 1991 WL 71034, at *8 (W.D.Mich. Jan.30, 1991) (upholding prison regulation foreclosing prisoners from participating in book-of-the-month clubs or other contract purchases); *cf. Mayberry v. Robinson*, 427 F.Supp. 297 (M.D.Pa.1977) (requiring that, before

prisoner could obtain publications that had not been prepaid, those publications be addressed to prisoner with correct name, prison number, and words "State Correctional Institution"). They have done so because such restrictions "remove[ ] the inducement for prisoners to defraud mail-order vendors," *Gardner*, 1991 WL 71034, at *9, and "prevent inmates from … obligating funds beyond their means." *Lena*, 1994 WL 99940, at *1. Defendants' pre-payment requirement passes constitutional muster. In any event, no case clearly establishes that such a requirement is unconstitutional. As such, Defendants are entitled to qualified immunity on Claim 11.

■ Courts have been more willing, however, to strike down outright bans on gift publications, at least in the absence of any superior state interest. *See Crofton v. Roe*, 170 F.3d 957, 960–61 (9th Cir.1999) (affirming injunction against no-gift-publications rule because state "has offered no justification for a blanket ban on the receipt of all gift publications, nor has it described any particular risk created by prisoners receiving such publications"); *Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir.2004) (reversing district court and concluding that state, on the present record, had not demonstrated that publication payment requirement, which effectively banned gift publications, was reasonably related to state interest in preventing prisoner in-fighting and managing prisoner behavior, and remanding for trial); *Lindell v. O'Donnell*, No. 06–1983, 2006 WL 3228601, at *2 (7th Cir. Nov.8, 2006) (recognizing that all-out ban on receiving printed internet materials, including from friends and family members, would be unconstitutional, but finding defendants entitled to qualified immunity); *cf. Wardell v. Duncan*, 470 F.3d 954, 961 (10th Cir.2006) (upholding no-gift-publications ban as applied to

given broad discretion to prevent such disorder' ").

gifts made by third persons linked to other inmates because "permitting third-party gifts and then trying to control the resultant security problems through reactive efforts within the prison would pose a burden on staff and resources," and finding *Jacklovich* and *Crofton* inapposite because they "involved broader claims for equitable relief facially challenging more restrictive regulations than those at issue here").

In their motion papers, Defendants deny the existence of a gift-ban policy. In response, Plaintiff points to one occasion in which he claims he was unconstitutionally subject to such a policy. Plaintiff states that in December 2003, he was denied four books by Defendants Harris and Jones that were sent by a publisher "because they were paid by Daker's family rather than by him off his prison account." (*See* Daker Aff. ¶ 36.) After Plaintiff filed a grievance relating to this issue, however, Plaintiff admits that "the issue was resolved in his favor." (*See* Pl.'s SMF ¶ 37; Defs.' Resp. to Pl.'s SMF ¶¶ 36–37.) Although Plaintiff claims that "prison officials did not enforce the grievance decision and the gift publications ban was still enforced haphazardly and arbitrarily," Plaintiff does not allege that the four publications that were paid for by his family were not delivered to Plaintiff after his grievance was granted. (*See* Pl.'s SMF ¶ 37.) Nor does Plaintiff allege any other instance in which he was actually or effectively denied publications pursuant to the alleged ban on gift publications.

Having reviewed the record, the Court concludes that Plaintiff has failed to bring forth sufficient facts of the existence of a gift-ban policy. The only facts underlying Plaintiff's challenge to the alleged no-gift policy concern a temporary withholding of four books that were apparently eventually delivered to Plaintiff as a result of a successful grievance. Since any initial denial of the four publications gifted by his family

was, as Plaintiff concedes, redressed by the prison's administrative procedures, there is no basis in the record to conclude that Defendants were acting pursuant to an unconstitutional ban on gift publications. Moreover, the Court's review of the "Inmate Property Disposal Agreement" respecting the denial of those books gives no indication that Defendants were acting pursuant to a gift-ban policy. (*See* Ex. AG to Pl.'s 23rd Aff. [234–3].) And in any event, as no Supreme Court, Eleventh Circuit, or Georgia Supreme Court case has yet considered the validity of a gift-publication ban, Defendants are entitled to qualified immunity. Accordingly, insofar as Defendants seek summary judgment on Claims 10 and 11 in Plaintiff's Complaint, their motion is **GRANTED**. Insofar as Plaintiff seeks summary judgment on Claim 10 and 11, his motion is **DENIED**.

### 3. Requirements to Request by Specificity (Claims 12, 17)

▇ In Claims 12 and 17, Plaintiff challenges the constitutionality of a GDC policy requiring that prisoners request a publication by name, title, and description in order to receive a publication from a book dealer or book club. Plaintiff claims that this policy is tantamount to "precensorship, in which before a prisoner may receive books, he had to submit a package request form along with the names and description so the requested books [which p]rison officials would then approve or deny ... based on the titles and descriptions of the books...." (*See* Pl.'s SMF ¶ 76.) In support of these claims, Plaintiff alleges that he was denied approval to take the college correspondence course *Law Enforcement Technology 260: Criminal Investigation* based on Defendants' review of his publication request form. Plaintiff argues that the First and Fourteenth Amendments mandate that prison officials physically inspect a publication before

making an exclusionary decision. Because the Court concludes, however, that Plaintiff does not have standing to pursue a facial challenge of the publication-request requirement, the Court does not take the occasion to consider its lawfulness here.

 The Court has discussed the limited nature of Plaintiff's standing to pursue a damages claim. To have standing, a plaintiff must first show that he "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). An injury in fact "cannot be an abstract injury." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004). Rather, a plaintiff "must point to some type of cognizable harm, whether such harm is physical, economic, reputational, contractual, or even aesthetic." *Id.* As the Eleventh Circuit has explained:

> The plaintiff must be directly affected apart from her special interest in the subject. To be particularized, we mean that the injury must affect the plaintiff in a personal and individual way. If the plaintiff is merely a "concerned bystander," then an injury in fact has not occurred.

*Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982)) (citations and quotations omitted)

While Plaintiff points to an instance in which he claims he was denied a particular publication as a result of the publication-request requirement, it is revealing that Plaintiff challenges the same denial of *Law Enforcement Technology* as a content-based denial in violation of the First Amendment (Claim 3). To prevail on either claim, he must demonstrate that he

was entitled to the publication at issue under the First Amendment, and that Defendants' exclusion of the publication was not reasonably related to any legitimate penological goal. The only difference with the present challenge is that Plaintiff seeks a court declaration that the GDC's publication-request policy is facially unconstitutional. As stated, Plaintiff may not, however, challenge the facial validity of the publication-request requirement. Since Plaintiff has failed to demonstrate how, by being subject to the package-request policy, he suffered any concrete and particularized injury separate and apart from the injury he suffered relating to the denial of the same publication—which is redressable through his First–Amendment content-based denial claim (Claim 3)—Plaintiff's challenge of the prison's package-request policy fails as moot. *See Wardell*, 470 F.3d at 959, 961. Accordingly, insofar as Defendants seeks summary judgment on Claims 12 and 17, their Motion is **GRANTED**. Insofar as Plaintiff seeks summary judgment on Claims 12 and 17, his motion is **DENIED**.

### 4. *Physical Restrictions* (Claim 13)

 In his thirteenth allegation, Plaintiff challenges a prison policy limiting the size and number of publications he was allowed to possess while incarcerated at GDC facilities. Plaintiff's facial challenge to GDC's restrictions also fails on standing grounds. Plaintiff has failed to allege concrete harm that he has suffered as a result of the imposition of the physical restrictions he challenges. Rather, any publication that was unlawfully denied to Plaintiff in violation of the First or Fourteenth Amendments may be recompensed through his First and Fourteenth Amendment claims.

That Plaintiff cannot facially challenge GDC's physical restrictions does not mean

that the "reasonableness" of the physical restrictions on publications policy may not be eventually in contention in this case. Indeed, should Defendants rely on their physical-restrictions policies in justifying certain procedural denials of Plaintiff's publications, they place the reasonableness of these policies in issue. Nevertheless, the limited nature of the present damages action precludes Plaintiff from facially challenging these physical restrictions.[19] Accordingly, insofar as Defendants seek summary judgment on Claim 13, their motion is **GRANTED**. Insofar as Plaintiff seeks summary judgment on Claim 13, his motion is **DENIED**.

### 5. Legal Materials of Other Inmates (Claim 15)

■ In his fifteenth allegation, Plaintiff challenges a GDC policy restricting prisoners from possessing or receiving the legal materials of other inmates. He claims that in 2004, while incarcerated at Central State Prison, prison officials rejected several mailings by other prisoners which contained copies of court decisions. When asked about the reasons for one of the exclusions, Captain Jones "said he denied it because prisoners may not receive legal material of another prisoner." (See Pl.'s SMF ¶ 87–90.) Defendants do not dispute that they maintain a policy preventing prisoners from sharing their legal materials. (See Defs.' Resp. to Pl.'s SMF ¶ 87.)

Courts have recognized that restrictions on inmate-to-inmate communications may be reasonably related to preventing communications relating to unlawful activity and maintaining security in general. See, e.g., Vester v. Rogers, 795 F.2d 1179, 1183 (4th Cir.1986) (upholding prison policy which required permission of warden before allowing prisoners to communicate by mail with prisoners in other institutions as reasonably related to the state's "need to impose a limit on the flow of information between inmates as a means of reducing institutional tensions and impeding the exchange of communication relating to unlawful activity"); see also Thornburgh, 490 U.S. at 412, 109 S.Ct. 1874 (noting that material which circulates within prison walls may has "potential for coordinated disruptive conduct and thus 'it is essential that prison officials be given broad discretion to prevent such disorder' "). Unfortunately, Defendants' summary judgment papers contain no discussion of the reasonableness of the challenged policy, thus placing the Court in a difficult position to address its constitutionality. Even assuming such a policy were unconstitutional, however—which the Court doubts—Plaintiff has not pointed the Court to any decision of the Supreme Court, Eleventh Circuit, Georgia Supreme Court, or any other court, for that matter, recognizing that a prisoner has a First Amendment right to another prisoner's legal materials. As such, the Court concludes that Defendants are entitled to qualified immunity. Defendants' Motion for Summary Judgment, insofar as it seeks judgment as a matter of law on Claim 15, is therefore **GRANTED**, and Plaintiff's Motion is **DENIED**.

### 6. Requirement that Printed Material be Sent by Publishers or Attorney (Claim 16)

■ In his sixteenth allegation, Plaintiff challenges a GDC policy requiring that all "printed material or photocopies" be

---

19. Even if the Court were to entertain Plaintiff's challenge, it is exceedingly doubtful that Plaintiff could prevail. See Isby v. Wright, 104 F.3d 362 (Table), 1996 WL 735595, at *3 (7th Cir. Dec.12, 1996) (upholding policy limiting prisoner access to one newspaper at a time in addition to paperback books and magazines); Kines v. Day, 754 F.2d 28, 30 (1st Cir.1985) (upholding prison policy limiting prisoners from receiving more than one package per month containing books or magazines).

sent by a publisher, dealer, or established attorney of record. In support of this allegation, Plaintiff alleges that Defendant Don Jarriel removed a paper copy of the court case *Mayweathers v. Terhune* from a letter sent to Plaintiff by a family member purportedly because "it was downloaded off the internet" and violated the rule that such material must come from a publisher or attorney. Plaintiff was given a "property disposal form" and a "property inventory form" informing him of the decision to censor the materials as prohibited material "copied from a book." (*See* Ex. U & V to 23rd Aff. Daker [234–2]; Pl.'s SMF ¶ 29.) Defendant's respond that they "do not have sufficient information to admit or deny" this allegation. (*See* Defs.' Resp. to Pl.'s SMF ¶ 29.)

As explained above, Plaintiff may not facially challenge the prison policy at issue. Nonetheless, Plaintiff may have a First Amendment interest in the photocopies and other clippings which he alleges were excluded by prison officials as the result of an overinclusive policy restricting inmates from receiving photocopies or newspaper clippings by mail. *See Allen v. Coughlin*, 64 F.3d 77, 80–81 (2d Cir.1995) (recognizing that there might be a constitution violation where prison officials remove "entirely innocuous" newspaper clippings from prisoner's mail pursuant to publisher-only rule, but finding that officials were entitled to qualified immunity). Nevertheless, the Eleventh Circuit has never addressed the constitutionality of such a policy, and other courts appear divided on the issue. *Compare id.; Lindell v. Frank*, 377 F.3d 655, 660 (7th Cir.2004) (concluding that publisher-only rule as applied to all newspaper clippings and copies, albeit a "close issue because of the deference prison administrators enjoy," was unconstitutional because of prisoner's "lack of other access to the restricted materials and the less exaggerated responses available to the prison," but finding prison officials were entitled to

qualified immunity); *Lindell v. O'Donnell*, No. 06–1983, 2006 WL 3228601, at *2 (7th Cir. Nov.8, 2006) (recognizing that all-out ban on receiving printed internet materials, including from friends and family members, would be unconstitutional, but finding defendants entitled to qualified immunity) *with Montgomery v. Coughlin*, 194 A.D.2d 264, 605 N.Y.S.2d 569 (N.Y.App.Div.1993) (upholding publisher-only rule as applied to remove newspaper clippings from prisoner's mail); *Hurd v. Williams*, 755 F.2d 306, 308–09 (3d Cir. 1985) (finding that publisher-only rule that restricted receipt of newspapers, periodicals, and softbound volumes was reasonably related to government interest in controlling smuggled contraband and saving staff resources). *Cf. Ward v. Washtenaw County Sheriff's Dept.*, 881 F.2d 325, 329 (6th Cir.1989) (upholding policy providing publisher-only rule including newspapers and magazines "as necessary to control the security problems caused when contraband such as drugs and weapons are smuggled in various books, magazines, and newspapers to inmates from unidentified sources or visitors"); *Thompson v. Campbell*, 81 Fed.Appx. 563, 569 (6th Cir.2003) (upholding publisher-only rule regarding books, magazines, and newspapers); *Kines v. Day*, 754 F.2d 28, 30 (1st Cir.1985) (same).

The absence of clarity within Georgia or the Eleventh Circuit on this issue entitles Defendants to qualified immunity. In view of the current split in doctrine, no reasonable Georgia prison official should have known that excluding printed material from Plaintiff's mailings violated the First Amendment. Accordingly, insofar as Defendants seek judgment as a matter of law on Claim 16, their Motion is **GRANTED.** Plaintiff's is **DENIED.**

## F. Retaliation (Claim 18)

In his final allegation, Plaintiff contends that Defendants Benton and

Jones have retaliated against him for filing this action and for filing grievances relating to this action. (*See* PSMF ¶ 102–11.) For example, Plaintiff claims that on May 5, 2005, he was "shaken down" and his shoes were confiscated as a result of sending legal mail pertaining to this case. (*Id.* ¶ 102.) Plaintiff also claims that his cell was stripped and searched 6 times in three months between June and August 2005. Finally, Plaintiff claims that Defendants Benton and Jones retaliated against him for refusing to stand up during a cell inspection. Plaintiff alleges that Defendants Benton and Jones placed Plaintiff in a strip cell for a temporary period of time, which effectively denied Plaintiff access to his publications and personal hygiene items.

▮▮▮▮ The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir.2003). "To state a first amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989). "The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Id.; see, e.g., Bridges v. Russell*, 757 F.2d 1155, 1156 (11th Cir.1985) (holding that a prisoner stated a claim of retaliation based on being transferred to another facility even though prisoners have no liberty interest in remaining at a particular facility). Rather, "a prisoner must demonstrate that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.' " *Farrow*, 320 F.3d at 1248 (quoting *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989)).

In their summary judgment papers, Defendants limit their defense to Plaintiff's retaliation claims by contending only that Plaintiff failed to file grievances and thus failed to exhaust his administrative remedies relating to these claims. However, as Plaintiff points out in his response, Plaintiff filed six grievances relating to the actions of Defendants Benton and Jones in July and August 2005, and each was denied outright or administratively closed due to Plaintiff's release from prison in October 2005. (*See* Pl.'s Resp. to Defs.' Mot. For Summ. J. [232–1] at 23–24.) Defendants, in their reply brief, do not contest Plaintiff's asserted efforts of exhaustion, and appear to abandon their claims that Plaintiff failed to administratively exhaust his retaliation claim.

Besides relying on their failure-to-exhaust argument, Defendants have not provided any evidence or argument tending to refute Plaintiff's allegations of retaliation. Indeed, in their Response to Plaintiff's Statement of Material Facts, Defendants simply "dispute these allegations as written," and do not provide any citations to the record that dispute Plaintiff's sworn testimony. (*See* Defs.' Resp. to Pl.'s SMF ¶ 102–111.)

▮▮▮ Local Rule 56.1 requires that Defendants respond with citations to evidence disputing facts alleged by Plaintiff. L.R. 7.1.(A)(1) NDGa. ("Every motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority. If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law.") Defendants have failed to cite any affidavit or other evidence disputing the alleged facts, supported by Plaintiff's sworn testimony, that Defendants Benton and Jones retaliated on a number of occasions against Plaintiff for filing grievances and claims relating to the issues in this litigation. Absent such evidence, the Court has no basis upon which to deny Plaintiff's Motion. *Powers v. CSX Transp., Inc.*, 190

F.Supp.2d 1284, 1286 n. 2 (S.D.Ala.2002) ("Although such evidence may exist somewhere in the record, it is not the Court's duty to comb the record to attempt to find reasons to deny a motion for summary judgment."). The Court concludes that no dispute of fact exists as to whether Defendants Benton and Jones retaliated in violation of the First Amendment against Plaintiff.[20] Furthermore, the Court finds that the right to be free from retaliation is clearly established and therefore Defendants Benton and Jones are not entitled to qualified immunity. *See Thomas*, 880 F.2d at 1242. Accordingly, insofar as Plaintiff's Motion for Summary Judgment seeks judgment as a matter of law on the liability aspect of Defendants' retaliation claims, that motion is **GRANTED.** Insofar as Defendants' seek summary judgment, their motion is **DENIED.** The Court will hear further from the parties on the issue of damages at the subsequent hearing.

## VI. Hearing on Remaining Issues

As previously discussed, the Court will hear from the parties further on several issues, which the Court considers may still be amenable to summary adjudication. At the time set forth below, the parties shall present evidence and argument respecting the following issues: (1) whether each of the approximately 52 incidents of publication denials by Defendants were constitutional under the First Amendment pursuant to *Turner v. Safley*, 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); (2) whether each of the approximately 52 incidents of publication denials were constitutional under the Fourteenth Amendment pursuant to *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978); (3) whether Defendants are entitled to qualified immunity on Plaintiff's First and/or Fourteenth Amendment claims; (4) whether Plaintiff is entitled to damages should he establish violations of the First and/or Fourteenth Amendments, and if so, the amount per violation; and finally, (5) the amount of damages to which Plaintiff is entitled for succeeding on his retaliation claim.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [220] is **GRANTED in part and DENIED in part.** It is granted insofar as Defendants seek judgment as a matter of law on Counts 1, 2, 6, 10, 11, 12, 13, 15, 16, 17, and 19 of Plaintiff's Complaint. It is denied insofar as Defendants seek judgment as a matter of law on Counts 3, 4, 7, 8, and 14 of Plaintiff's Complaint.

Plaintiff's Motion for Summary Judgment [234] is **GRANTED in part and DENIED in part.** It is granted insofar as it seeks judgment as a matter of law on the liability aspect of Claim 18 against Defendants Benton and Jones for retaliating against Plaintiff in violation of the First Amendment. It is denied in all other respects.

---

**20.** To the extent that Plaintiff alleges a violation of the Eighth Amendment, however, the Court concludes that Plaintiff's claim fails as a matter of law. Plaintiff has alleged only that he was temporarily placed in a strip cell without personal hygiene materials. He does not specify the length of time in which he was deprived of such materials. At best, Plaintiff alleges a *de minimus* injury that does not rise to the level of the objectively serious injury required to establish an Eighth Amendment violation. *See Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir.2007) (ruling an Eight Amendment violation can be established "only if there is more than *de minimis* injury"); *Hilton v. Secretary for Dept. of Corrections*, 170 Fed.Appx. 600, 604 (11th Cir.2005) (holding that spitting of tobacco juice in inmate's face was "de minumus" and thus not redressable by claim under the Eighth Amendment); *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir.2002). Thus, to the extent that Defendants seek summary judgment on Plaintiff's claim under the Eighth Amendment, their motion is **GRANTED.**

Plaintiff's Motion to Amend his Complaint [245] is **GRANTED.** The Court **DISMISSES** Counts 5 and 9 of Plaintiff's Complaint without prejudice.

The parties are hereby **ORDERED** to appear before the Court on the 13th day of March, 2007 at 2:30 p.m., Courtroom 2105, United States Courthouse, 75 Spring Street S.W., Atlanta, Georgia for a hearing on the issues set out above.

**SO ORDERED** this 26th day of February, 2007.